398      SUPREME COURT,

The People of the State of Michigan *vs.* The Michigan Southern and Northern Indiana Railroad Company.

## The People of the State of Michigan *vs.* The Michigan Southern and Northern Indiana Railroad Company.

Section 31 of the Charter of the Michigan Southern Railroad Company (*Sess. L.* 1846, *p.* 191), provides that "said Company shall pay to the State an annual tax of one half of one per cent. upon the capital stock paid in, including the five hundred thousand dollars of purchase money paid, or to be paid, to the State, until the first day of January, 1851, and thereafter an annual tax of three-fourths of one per cent. upon its capital stock paid in, including the five hundred thousand dollars of purchase money aforesaid; and also upon all loans made to the said Company for the purpose of constructing said railroad, or purchasing, constructing, chartering, or hiring of steamboats authorized by said Act to be held by said Company; which tax shall be paid in the last week of January in each year, to the State Treasurer.

Section 3 of the Act authorizing the consolidation of the said Michigan Southern Railroad Company with the Northern Indiana Railroad Company, approved February 13, 1855 (*Sess. Laws* 1855, *p.* 302), provides that said Corporation, so to be organized by virtue of said Act, shall continue subject to the same rate of tax as though such consolidation should not take place; and the amount of its capital and loans thereafter, upon which such taxation should be paid, should be such portion of its capital and loans as is actually employed in the State of Michigan, to be ascertained on or before the first day of January of each year, by the Auditor General, from the annual reports of said Corporation, etc. The specific tax assessed upon the Company for 1855, included a sum assessed upon three hundred thousand dollars of its stock, which was allowed by the Company as a "bonus," or "dividend," to the original purchasers of the road, no part of which was ever "paid in," though standing on the books as a part of the capital stock. Said specific tax also included an amount assessed upon the sum of one hundred and eighty-five thousand, four hundred and fifty-nine dollars and eighty-four cents discount, or loss, in the sale of a portion of the bonds issued by the Company for loans made for construction, whereby the amount of such loan was less by this sum, than the face of the bonds so issued. Another portion of the sum so assessed, was upon the amount of certain bonds issued by the Company in exchange for those of another Company, and which latter were still undisposed of by the Company, and which it was claimed did not, therefore, in fact represent a loan made for the purpose of constructing said railroad.

*Held,* that each of said items constituted a proper basis for computing the specific State tax required by the charter of the Company to be assessed by the Auditor General.

The People of the State of Michigan *vs.* The Michigan Southern and Northern Indiana Railroad Company.

Case reserved from Lenawee Circuit.

*J. M. Howard*, Attorney General, for the plaintiffs.

*Baker & Millerd*, and *H. H. Emmons*, for defendants.

By the Court, GREEN, J.

This is an action of debt brought by the plaintiffs to recover of the defendants a portion of the specific tax alleged to be due from them to the plaintiffs, and unpaid, for the year 1855 ; amounting, as is claimed, to the sum of $3,706.76 ; the amount of tax assessed for that year by the Auditor General being $38,442, and the amount paid by the defendants being $34,735.24.

The above balance remaining unpaid, was assessed upon three items, which are stated in the supplemental report of the Company to the Auditor General, made for the purpose of taxation, in March, 1856, to wit : 1. $300,000, " being a bonus or dividend allowed by the Company to the original purchasers of the road, no part of which was ever ' paid in,' though standing on the books as a part of the capital stock."

2. $185,459.84 discount or loss, in the sale of a portion of the bonds issued by the Company, for loans made for construction, etc., whereby the amount of such loans was less by this sum than the amount of the bonds so issued, etc.

3. Amount of Jackson branch bonds, which were issued in exchange for bonds of another Company, which latter bonds are still held undisposed of by the defendants, and do not, therefore, in fact, represent a " loan made for the purpose of constructing said railroad," and were never so used by the Company, $435,459.84.

The question now presented for the opinion of this Court is, whether the above items, or either of them, constitute a proper basis for computing the specific State tax, required

by the charter of the Company to be assessed by the Auditor General, and paid to the State Treasurer.

By the 31st Section of the Act to provide for the sale of the Southern Railroad, and to incorporate the Michigan Southern Railroad Company (*Laws of* 1846, *p.* 191), the Corporation is required, after the first day of February, 1851, to pay to the State an annual tax of three-fourths of one per cent. upon its capital stock paid in, including the $500,000 of purchase money paid, or to be paid, to the State, and also upon all loans made to said Company, for the purpose of constructing said railroad, or purchasing, constructing, chartering or hiring of steamboats, authorized by said Act to be held by said Company; in consideration whereof, the property of said Company was to be exempted from all and every other tax, charge and exaction, by virtue of any laws of this State then or thereafter to be in force, except penalties imposed by that Act.

The third section of the Act to authorize the Michigan Southern Railroad Company to consolidate with the Northern Indiana Railroad Company (*Laws of* 1855, *p.* 300), provides, that the Corporation to be organized under that Act, shall continue subject to the same rate of tax as though such consolidation should not take place, and that the amount of its capital and loans thereafter upon which such tax should be paid, should be such proportion of its capital and loans as is actually employed in the State of Michigan, to be ascertained on or before the first day of January in each year, by the Auditor General of this State, from the annual report of said Corporation; or such other reports on oath as he might deem necessary for such purpose, to be ordered by him from the office of such Corporation.

The capital stock of the Michigan Southern Railroad Company was two millions of dollars, with the privilege of increasing the same to three millions, and to be divided into

shares of one hundred dollars each. Three thousand shares of this stock was, according to the report, allowed as a bonus or dividend by the Company to the original purchasers of the road, and entered upon the books of the Company as a part of the capital stock. No money was paid to the Company for those shares of stock, but, if we understand the transaction, this stock was issued by the Company, and used *instead of money*, in obtaining the rights of the original purchasers of the road from the State, and has been treated and considered by the Company as so much stock paid in, making it of equal value with the other paid-in stock of the Corporation, and entitling the holders thereof to all the rights and privileges of other stockholders. It is difficult to perceive, therefore, in what sense this stock can be regarded as fictitious. If the Company had bought in from individual shareholders, this amount of stock which had been paid in, and allowed the same to the original purchasers as a bonus, the transaction would have been, in effect, precisely the same, and the character of the stock in the hands of the holders would have been the same in all respects.

It is assumed that these shares represent no actual capital whatever; but upon what ground such assumption can be maintained, I am not able to see. It is clear that the holders of these shares have an interest of the same character, and to the same extent as the holders of any other equal number of the shares of such stock. Why, then, do they not as much represent actual capital? We think they do, and that in contemplation of law, they represent so much of the capital stock of the Company actually paid in. Upon the hypothesis of the counsel for the defendants, that "the law intended to tax the fair value of the property of the Corporation in this State, including road, fixtures and steamboats," we could arrive at no other conclusion. We cannot suppose that the Company *allowed* the large amount of stock in question to the original

51

purchasers, without getting a fair equivalent in the value of the property thereby acquired. But even if it had been issued as a mere gratuity by the Corporation, if they chose to assume that the capital it represents had been actually paid in, we think they are bound by that assumption, and equally liable for the tax, as if they had received the full nominal amount in money. If the Corporation had appropriated $300,000 of the money paid in by shareholders upon their stock, to pay this bonus, could they not with as much propriety ask to be exempt from paying the tax assessed upon it, for the reason that such amount is no longer capital stock of the Corporation? Could they say that all the shares issued by the Company actually represent so much less capital stock? Yet such a proposition would be too fallacious to require refutation.

Bonds of the Company have been issued for a greater amount than the money borrowed by the Company, and we are requested to "bear in mind that the Corporation is taxed upon their loans by way of measuring the costs of their construction." By the Act of 1850, amendatory of the charter of the Corporation (*Laws of* 1850, *pp.* 196, 197), it is authorized to issue its corporate bonds or obligations for such amounts, not less than five hundred dollars, and in the aggregate not exceeding their capital stock, in such form as it might deem proper, payable at such times and places, upon such terms, and with such rates of interest (not exceeding eight per cent. per annum) as it might determine, and to sell and dispose of such bonds or obligations, either within or without this State, at such rates, for such prices, and on such terms as said Company might determine, "for the purpose of providing means for the payment of its debts, and the construction, extension and completion of its railroads, buildings, etc.

Pursuant to the power thus conferred, the Company made

different classes of bonds, denominated respectively "first
mortgage," "income," "plain bonds," and "Jackson branch
bonds," amounting in all to two and a half million of dollars,
and it is claimed that upon the sale of a *portion* of those
bonds there was a discount or loss of the sum of $185,459.84,
which should not be taxed.  Whether upon the *entire* sales
there was a loss or gain to the Corporation, is not shown by
the report.  For those which were sold at par, or for a
premium, the amount of the bonds is assumed as the measure
of the loan, and this, undoubtedly, is in accordance with the
true intent of the charter.  The actual cost of construction,
etc., to the Company, is the means they employ, or the cost
of the loans by means of which the work is accomplished.
If by offering a high rate of interest, and ample security by
a first mortgage upon their road and fixtures, they make their
bonds worth in the market a premium of two or three per
cent. above par, the excess would be so much profit or bonus
to the Company, and not properly a part of the loan.  On
the other hand, if bonds are made without interest, and
offered in the market without security, and are consequently
sold at a discount, the Company may be considered as *paying*
a premium or bonus to the purchaser to obtain the loan.  If,
for instance, a bond of the Company for $1000 were sold for
$950, and the proceeds used in constructing the road, the
cost of the work which this latter sum would accomplish
would be $1000, the amount of the bond, and taxing the
Corporation upon this sum as the true measure of the cost of
construction, would therefore be just, and in accordance with
the rule propounded by the counsel for the defendants.

Any other rule would be very inconvenient and uncertain
in practice, and would lead to very perplexing results, both to
the Corporation and the State.

If losses upon the sale of bonds were to be deducted, gains
on premiums would be added, and other losses and gains

might, perhaps, with equal propriety, be taken into the account, in estimating the amount assessible for taxes, not, in our opinion, contemplated by the charter of the Corporation.

The determination of the third question arising in this case, must depend upon the construction which is to be put upon the transaction connected with the Jackson branch bonds, as stated in the report. That report states the amount of Jackson branch bonds issued to be $500,000, but claims a deduction therefrom, for purposes of taxation, of $435,459.84 "for this amount of the Jackson branch bonds, which were issued in exchange for bonds of another Company, which latter bonds are still held undisposed of by the Michigan Southern and Northern Indiana Railroad Company, and do not, therefore, in fact, represent a loan made for the purpose of constructing said Railroad, and were never so used by the Company."

In the brief of the defendant's counsel, this transaction is stated as follows : "We have issued certain bonds by way of loaning our credit to the Chicago and Mississippi Railroad Company, and received *by way of collateral security*, their bonds, which are now locked up in our safe. In this we do not make a loan ; we do not borrow any money; we do not receive any ; we get nothing which we can use—no addition to our property in Michigan."

If such were the true rendering of the language of the report, there would be no difficulty in arriving at the conclusion, that the bonds so exchanged do not properly constitute a loan for which the Corporation ought to be taxed. The report states, that they were exchanged for the bonds of another Company, which latter are still held undisposed of. This language does not import that they were received as collateral security, but on the contrary, the legal implication is, that by the exchange they became the property of the Corporation, subject to its absolute disposal, and to be used and

applied by it as such. The legal presumption, in the absence of any showing to the contrary, is, that this Corporation issued its bonds under and in pursuance of its charter, "for the purpose of providing means for the payment of its debts, and for the construction, extension, and completion of its railroads, shops, depots, buildings, and equipments," and for no other purpose whatever, and that such exchange was a sale or final disposition thereof, for which they received the bonds of another Company as *payment*. These latter bonds, whether still held undisposed of, or used and appropriated, cannot, therefore, we think, be regarded otherwise than as a loan, made to the Company for the purposes of construction, etc., and as such, constituting a proper basis for the computation of the specific tax. They constitute a portion of the "*means*" provided, in pursuance of the charter, for the purposes above enumerated, and whether such "means" consist of bonds, bank notes, specie, or bills of exchange, can make no difference. The Company has the avails of its loan in such form as it thought proper to place them, and they must be taken to be of the value which their cost indicates.

We do not think the third section of the Act of 1855, authorizing the consolidation of the two Companies, was intended to exempt any portion of the capital or loans of the Corporation from taxation. The business of the new Corporation was to extend through a neighboring State, where a large portion of its capital and other means must necessarily be used; and hence it became necessary to distinguish between what should be subject to taxation in this State, and what should not. It was, therefore, provided that the Corporation, so to be organized, should *continue subject to the same rate of tax* as though such consolidation should not take place, and that the amount of its capital and loans thereafter, upon which such tax should be paid, should be such portion of its whole capital and loans, as is actually employed in this State.

Construing this section together with the provisions of the original charter, it is apparent that the Legislature regarded all the capital stock paid in, and the loans made to the Corporation for the purposes authorized by the charter, as "actually employed," whether actually expended in building the roads, etc., or on hand for that purpose, in the form of money, bills of exchange, or bonds drawing interest.

These could hardly be regarded as *unemployed*, in the sense ordinarily applied to that term by capitalists. Capital specially appropriated, set apart, and devoted to a particular purpose, is said to be employed or in use. In this sense, we are constrained to think, the Legislature used the term *actually employed.*

In accordance with the forgoing views, it must be certified to the Circuit Court for the County of Lenawee, as the opinion of the Supreme Court, that the plaintiffs are lawfully entitled to recover from the defendants the balance of the specific State tax, assessed against them by the Auditor General for the year 1855, after deducting the amount already paid by them on account of such tax.

Present, Green, Johnson, Bacon, and Martin, J. J.