## The Michigan Southern and Northern Indiana Railroad Company v. The Auditor General.

Under the charter of the Michigan Southern Railroad Company—which subjects the company to an annual tax of three-fourths of one per cent upon its capital stock paid in, including the $500,000 purchase money, and also upon all loans made to the company for the purpose of constructing their road, or purchasing, constructing, chartering, or hiring of steamboats authorized by the charter—the company can not claim exemption from taxation on sums of money paid out for commissions and other expenses attending the sale of its bonds and the obtaining of loans.

Nor can the company claim exemption from taxation upon any sum of money borrowed by it, and afterwards loaned upon worthless securities, whereby it became lost to the company.

Whether a deduction from the taxable amount should be made of bonds of the company which were loaned, and for which worthless securities were subsequently taken in payment, quere: the Court being equally divided on the question.

Whether the amount of the bonds of the company issued for loans, is to be taken as the amount of its loans, for the purposes of taxation, within the meaning of the law, or whether from this amount should be deducted the discount allowed on the sale of its bonds, quere: the Court being equally divided on the question.

No deduction should be made for the 3000 shares of capital stock alleged by the company to have been distributed as a bonus among the original stockholders without any consideration being received therefor, the allegation not being sustained by the proof in the case.

The act authorizing the consolidation of said company with the Northern Indiana Railroad Company provides that said corporation shall continue subject to the same rate of tax as though such consolidation should not take place; and the amount of its capital and loans thereafter, upon which such taxation should be paid, should be such portion of its capital and loans as is actually employed in the State of Michigan. It was held that the act of consolidation was not designed to change the principle of taxation fixed by the original charter of the Michigan Company, but that all the stock and loans formerly taxable were to continue taxable without diminution by losses or unproductiveness.

No deduction can therefore be made from the amount taxable, for the cost of steamboats destroyed by accident, or lying idle within the limits of another State and taxable there. The term "actually employed in the State of Michigan" in the act of consolidation, has no reference to the actual use of the property purchased by the company, but is merely designed to distinguish the Michigan investment from the Indiana investment.

*Heard October 11th, 12th and 15th, 1861.  Decided January 9th.*

Appeal in Chancery from Wayne Circuit.

*Warner Wing* and *H. H. Emmons*, for complainants.

*C. Upson, Attorney General,* and *J. P. Whittemore,* for complainants.

CAMPBELL J.:

The bill in this cause was filed to restrain the collec-
tion of ·$11,718,34, being a balance claimed to be due from
the complainants to the State of Michigan for specific
taxes. The complainants claim that this amount of tax is
made up of three fourths of one per cent on six separate
items, all of which they insist are exempt from the tax.
These items are set forth in the bill as consisting of, *First*,
$300,000 of stock which is averred to consist of three
thousand shares which it is alleged were issued in 1849,
and delivered to the "then several stockholders of the
company, without any consideration therefor, without any
subscription being made for said stock, and without any
promise from any person whatsoever to pay the amount
or any part thereof to said company, nor was any capital
directly or indirectly, actually or technically, paid to said
company on account of said certificates;" *Second*, $185,-
459,84 which is the amount of discount on the sale of com-
pany bonds below par; *Third*, $250,000 of bonds known
as Jackson Branch bonds, which were never sold by the
company, but were lent and disposed of by the borrower,
who had turned out as collateral the bonds of the Chicago
and Mississippi Railroad Company, which the complainants
took on settlement and now hold, and which are averred
to be worthless; *Fourth*, $466,848,02, being the cost of
various steamboats, one of which was destroyed some years
since, and the remainder are alleged to have been em-
ployed and taxed in other states, and of late have been
unemployed and lying idle; *Fifth*, $300,000 lent by com-
plainants to the Chicago and Mississippi Railroad Com-
pany, and secured by worthless securities; *Sixth*, $60,136,-
87 expenses incurred in obtaining loans and selling bonds.

Before inquiring into these items it becomes necessary
to consider a question raised on behalf of the defendant,
and which is claimed to preclude any investigation of these

matters. It is insisted that the whole controversy is bound by a previous adjudication of the Supreme Court in the case of *The People v. The Michigan Southern and Northern Indiana Railroad Company,* which is reported in 4 *Mich.* 398. In that case three of these items were considered, and it is claimed, inasmuch as all of them then existed, the company became estopped by the decision, on the principle that what has become *res adjudicata* can not be disturbed. Without considering the technical defects of the answer and proofs on this specific defense, I think it is founded on a misapprehension of the rule. The only controversy in the record in that case, was whether a certain portion of the tax of 1855 was due and payable. That controversy only was disposed of; and if any estoppel arises it can not go further. Estoppels arise upon facts, and not upon questions of law. When the latter are decided, they have no further importance than as precedents. That case therefore has no bearing upon any question of law not considered in it. How far it bears upon any of the questions now before us, under the new allegations and proofs adduced in this cause, I shall consider presently.

The first questions which I propose to examine are those not presented in that case, and which may therefore be regarded as new questions. And for convenience they will be taken up in their inverse order.

The complainants claim an exemption of tax on $60,-136,87, paid out for commissions and other expenses attending the sale of bonds and the obtaining of loans. I do not perceive upon what ground this exemption can be claimed. The loans which caused these expenses were taxable. The expenses were mere agency expenses, in no wise differing from any other outlays for services. The law does not undertake to follow the money of the company to its several destinations. When once borrowed the company can use it for the proper objects; and should, I think, be held responsible for taxes on it, whether spent

profitably or not. No business can be transacted without some unproductive expenditures. The employment and payment of agents is an ordinary necessity, and it is always presumable that their services are worth what they cost. These charges form, I think, no cause of exemption.

The same objection applies to the demand to have a deduction from the tax on account of $300,000 lent by complainants to the Chicago and Mississippi Railroad Company. Having borrowed money which became taxable as a loan, the complainants did not cease to be debtors for the amount by lending it or giving it away. Such a loss might afford an argument for legislative relief, but it can not change their position as borrowers, nor diminish the amount of their loans.

The next item embraces the cost of the steamboats. It appears that one of them has been lost, and that the rest have been lying at Toledo unproductive, and have been taxed in Ohio. This exemption is claimed on the ground that complainants are not taxable for any capital or loans not " *actually employed in the State of Michigan.*" The third section of the act of consolidation between the Michigan and Indiana Company is relied upon for this exemption. That section is as follows: "The said corporation so to be organized, by virtue of this act, shall continue subject to the same rate of tax as though such consolidation should not take place; and the amount of its capital and loans hereafter, upon which such taxation shall be paid, shall be such portion of the whole of its capital and loans as is actually employed in the State of Michigan," &c. By the original charter, the Southern Railroad Company was liable to a tax of three-fourths of one per cent upon the capital stock paid in, and upon all loans made to the company for the purpose of constructing the railroad, or purchasing, constructing, chartering or hiring steamboats.

By imposing the tax on stock and loans, and exempt-

ing the company from other taxes, it is evident the design was to have a standard readily ascertained, and which was not likely to fluctuate. The chance of profit, without which no such work would be undertaken, and whereby under ordinary circumstances, the taxes would be increased, was balanced by the chance of losses, whereby taxation would be diminished. It never was designed that the tax should be lessened by any disaster, any more than that it should be increased by any amount of prosperity. I do not think the consolidation act was designed to infringe upon this principle. When it declares the rate of taxation shall continue the same, it appears to me evident that all the stock and loans formerly taxable were to continue taxable without diminution by losses or unproductiveness. Otherwise the company might continue to own the same identical property, and if found not profitable, might by leaving it idle, exempt it entirely, when if in private hands it would be taxable upon a valuation. And if exempted for losses there would be great inequality unless they should be made liable to increased taxation in proportion to their profits. I think the true meaning therefore of the whole section, which refers to capital and loans actually employed in Michigan, must be deduced from the design of the new law to apply the old principle as far as possible to the new state of things. The original company was a Michigan company, and all of its capital was in the eye of the law employed in this State. Whatever money it may have expended in feeders by land or by water must have been regarded as merely ancillary to its home business, and expended upon it. Had any losses then taken place no one can suppose they could have formed any basis for a deduction from the taxes on stock and loans.

The object of the consolidation act was to enable this company to form a union with another company in Indiana; and by the terms of the act the new corporation was to be governed substantially by the old charter. That

other company being formed under the laws of another State, held its own property exempt from our laws. There was no reason why that should not remain exempted, while there was no reason on the other hand for exempting what was already subject to our jurisdiction. Looking at the whole subject, I think the term "actually employed" has no reference to the actual use of the property purchased by the company, but is merely designed to distinguish the Michigan investment from the Indiana investment. Because the capital of a company or an individual has been used to purchase a steamboat, it can not in any just sense be regarded as employed in every part of the world where the vessel may navigate, nor as unemployed when she is in ballast, or losing money, or laid up. The capital of an individual is regarded as employed or invested at the place where the owner does business. The capital of a New York or Boston merchant is employed in New York or Boston, no matter where his ships may be. This is the view taken by the Supreme Court of the United States in *Hayes v. The Pacific Mail Steamship Company*, 17 *How.* 596, where New York vessels employed in the California trade were held exempt from taxation in California. Whether allowing vessels or other property to remain in a place for a length of time may or may not confer a right to tax them there, is not decisive of the other question. The capital remains invested where the owner transacts his business, and is not transitory. The bill shows the steamboats were a part of the original Michigan investment. They remain in specie the property of the company, except one which was destroyed. I do not perceive how the original investment has been altered. And therefore, I think no deduction should be made from the tax on their account.

The next item on which a deduction is claimed consists of $250,000 of Jackson Branch bonds, which were lent by complainants and misappropriated. This item was considered

by the, court in the case in 4 *Mich.* 398. It was there held that, inasmuch as these bonds were there stated to have been exchanged for other bonds of another company, it must be presumed that the latter were regarded as an equivalent. The case as now presented is different, and no such presumption can arise. It now appears that there was no exchange of securities whatever, but that the complainants, when they were unable to recover their own bonds, accepted the collaterals in payment. When collected or sold, or otherwise disposed of for value, I think the proceeds of these may fairly be considered as a loan to the complainants. But so long as they remain on hand uncollected and unconvertable, they can not fairly be considered as money or its equivalent. No loan has been made to the complainants on the credit of these Jackson Branch bonds, until some benefit has accrued from them.

The next item embraces $185,459,84, which sum represents the discount on bonds sold. It was held in the case before referred to, 4 *Mich.* 398, that the loans to the company must be taken to stand at the face of the bonds. This, I think, is a fair presumption, but not a conclusive one. The law permits complainants to sell their bonds at a discount, and therefore contemplates that they may have to repay more than they borrow. The tax is to be laid "*upon all loans made to said company.*" *Sec.* 31 *of Charter, Laws* 1846, *p.* 191. Nothing is lent which does not pass from the lender; and if in return for his ninety dollars he is to receive ninety-five or a hundred, he still lends but ninety. It appears that no bonds were sold at a premium, and that the amount of loans was less than the face of the bonds by the amount above mentioned. I think no tax can be properly laid on this sum, because it was never borrowed.

The remaining item of $300,000, is claimed to be exempt from taxation because it is alleged to consist of 3000 shares of stock distributed among the stockholders in 1849,

without any consideration paid, and without any subscription or promise to pay for it. It is also alleged that no portion of the means of the company was ever obtained from such stock. This is the same ground upon which payment of the tax was resisted in the case before referred to for the year 1855.

The term used in the section under which the tax was originally laid is "capital stock paid in." Upon the case made by the bill the company deliberately issued stock as paid, and has always so treated it. It has, as fully appears, changed hands so as to become entirely confused. The holders of it have received dividends upon it, as full paid stock. It so stands for all ordinary purposes. I see no hardship in holding complainants responsible for taxation on what they hold out to the world as cash capital. And in this respect, I think the former decision was right. The company had debarred itself upon this theory from calling any more assessments. And the ordinary understanding of stock paid in, is stock on which no further calls can be made. It is a matter of daily occurrence to pay for labor and other expenditures in what is termed "full paid stock," at rates very different from what would be required in cash. The company obtains the same credit for one kind as for another when it seeks public confidence on the ground of its paid up capital. If instead of taxing the company, the several stockholders should be taxed on stock, one share would avail no more than another.

But when we examine the evidence, the case made out by the bill is not only not established but entirely disproved. And as a complainant must rely upon the case set up in his own bill, he is entitled to no relief, even if the rule of law laid down in deciding the former case were to be disregarded.

It appears by the sworn report of the complainants upon which this tax is chiefly based (p. 18 of case) that the total amount of capital stock subscribed in the entire con-

solidation is $9,413,800, and that the amount actually paid in is $9,408,802 32. As no more than its face is likely to be paid in, this would leave a deficiency of only $4,997,68, to be applied to the entire stock. It is true the same report contains at its close an averment of the amount of the capital stock of the Michigan Southern Railroad *at the time of the consolidation*, showing then the deficiency of $300,-000 on account of nominal stock, stating, "*no part of which however was ever paid in.*" This statement, if true, is consistent with a payment subsequent to the consolidation. Mr. Bliss, however, by his testimony, shows that this report, which he also verified, is incorrect.

Being asked by the second and fifth interrogatories concerning the existence of unpaid stock, he shows a deficiency of about $160,000, which he thinks was for that amount unpaid on 8000 shares of stock. The evidence of the amount refers under the second answer to the time of the consolidation. The fifth answer appears to show that, so far as he knows, it was never paid. This makes a discrepancy in the report of $140,000, if we entirely disregard the small deficit appearing in the sum total of consolidated stock, which, however, from its minute accuracy has evidently been taken from accounts and not from estimates.

The testimony of Mr. Bliss, however, and the exhibits A and B, which he proves from the company's records, show very clearly the character of the stock distribution of 1849, and show conclusively that there was never any distribution of 3000 shares of fictitious stock, nor any other amount of that kind. It appears from those resolutions, that the stock which had been divided into 5000 shares was recalled, and a new division of 8000 shares made in lieu of it, all to stand on the same footing — all credited equally with what had been paid in, and all equally chargeable with future calls. The amount paid in on each share was $45, making an aggregate of $360,000. There is no reason to suppose that any portion of this sum was fictitious.

By the charter, complainants were required to pay previous to this time $175,000 of principal, and, besides this, interest, which at six per cent. computed as the various instalments became due, would amount to $60,000 more, making an aggregate of $235,000 on this account alone. The charter required an immediate expenditure of $20,000 for [rolling stock (*Sec.* 2, *L.* 1846, *p.* 171). The company was also required to proceed at once with various lines to be constructed or finished within given periods. Whether this work was done or not, it is hardly presumable that the remaining sum of $105,000 would exceed the expenditures on construction account for the first three years, over and above any earnings so applied. But be this as it may, no portion of the testimony in any way goes to discredit the fairness of the basis of the resolutions.

It was claimed by complainants' counsel on the argument, that the testimony of Elisha C. Litchfield shows the fictitious character of the 3000 shares. That testimony is not very intelligible, and is evidently an attempt to explain the issue upon a mistaken theory. But if its facts be taken as accurate, its deductions are clearly erroneous, and would show merely a deficiency of $38,470 unpaid, instead of making that sum represent the entire payment. The resolutions of August, 1849, made the whole 8000 shares liable to further assessments to the amount of $55 per share, or $440,000, supposed to represent the debts and liabilities of the company. These debts Mr. Litchfield puts down as consisting of $325,000 unpaid principal of the purchase money due the State, and $76,530 debts for prior loans. By deducting these from $440,000, he deduces the balance of $38,470. He treats this sum of $440,000 as if it had been credited to the stock, when it was on the contrary charged on it, and, unless it exceeded the debts, it made the stock liable to its entire face. The interest on the $325,000 of State indebtedness at six per cent., if principal and interest should be paid promptly, would amount to $68,250, which not only

extinguishes the balance of $38,470, but would leave an excess of about $30,000 after the face of the stock should have been paid in.

When all the evidence is collated, it is impossible to say that any particular deficiency, or any deficiency, is made out. The issue of any fictitious stock is clearly disproved. And all the stock being put on the same basis, it is not presumable that assessments have been since made on any but the just and equal principles which are required by law to be observed. The case does not assume any thing of this kind. Neither is it averred or shown that any assessments called on this stock remain unpaid. The payment of dividends on it would be inconsistent with such a theory. The books of the company must show the precise state of the stock account in regard to the whole issue. The evidence is in the control of the complainants. Until the original sources of evidence are resorted to, all outside testimony must be vague and unsatisfactory, as this record very fully exemplifies. If complainants have not received what should have been received on any of this stock, no one else has the means of ascertaining it, and I do not think their proofs at all satisfactory.

I am of opinion that a deduction should be made from the amount to be taxed of $250,000, for the lent bonds, and $185,459,84, for discounts on loans, and that no further deduction should be allowed on the case presented.

CHRISTIANCY J.:

I concur in the opinion of my brother Campbell, with the single exception of the views he has intimated upon a question which, so far as regards the proof, is merely hypothetical.

Had it appeared in evidence, as alleged in the bill, that $300,000 of fictitious stock had been issued upon which nothing had in fact been paid, I should not be prepared to hold that it could be taxed under a charter which taxes

only "capital stock paid in;" notwithstanding the company may have held it out to the world as full paid stock. I am not satisfied that the doctrine of estoppel has any application to such a case, though as a question of public policy, its effect may be salutary in restraining the issue of fictitious stock.

But as I concur entirely in the view my brother Campbell has taken of the evidence, that, as respects this item, the proof fails to sustain the case made by the bill, I forbear to enter upon the discussion of the case upon this hypothesis.

MANNING J.:

This court in the case of *The People of the State of Michigan v. The Michigan Southern and Northern Indiana Railroad Company*, 4 *Mich.* 398, decided the present complainant was not entitled to any deduction from its tax on the capital stock and loans of the company on account of the 3000 shares of stock alleged to have been gratuitously distributed among its stockholders; and the $185,459,84 lost by the company in negociating its loans; and the $250,000 of Jackson Branch bonds. That decision I think was correct.

The charter of the Michigan Southern Railroad Company makes the capital stock and loans of the company for constructing the road the basis of the tax to be paid to the State. In doing this, the Legislature probably intended the company should pay to the State, after the first day of February, 1851, three quarters of one per cent. on what the construction of the road should cost the company. But how should the cost of constructing the road be ascertained? Should it be left with the company who was to pay the tax to fix the amount? or should the capital stock and loans made by the company, as the company would have no other means to build the road, be taken as the cost of the road, and be made the basis of taxation? The latter

was probably adopted as less objectionable than the former. However that may be, the company is required to pay a tax of three - fourths of one per cent. annually to the State on its capital stock paid in, and upon all loans to the company for constructing the road. And the question is, what is meant by *capital stock paid in*, and *loans made to the company*.

By the words "*capital stock paid in*," I understand that the company is not to be taxed on what is due it from its stockholders, who would be called on from time to time to pay for their stock as the work progressed, and the company should stand in need of the money. It was not intended to exempt from taxation stock which the company, for some imaginary or actual past or future benefit, or other cause, might think proper to dispose of without an equivalent in money. Such stock, within the meaning of the charter, is paid in, as there is nothing due on it to the company to be paid at a future day. When I say I own a certain number of shares of stock, with ten per cent. or any other amount paid in, my language implies, and I am understood as saying, at the same time, that there is something still due from me to the company whose stock I hold.

And "upon *all loans* made to said company," &c. This language, it is to be observed, is not upon all *moneys borrowed or received* on its loans; but "upon all loans made." There is a difference between these phrases, and they can not be used or construed to mean the same thing when the money received is less than the amount mentioned in the bond given to secure the loan. The loan is the sum mentioned in the bond, and not the money received, and the interest payable on the loan, is interest on the amount mentioned in the bond, and not on what the bond may have been sold for in the market to effect the loan.

By a recent act of the Legislature, the Governor and State Treasurer are authorized, for war purposes, to negociate and contract for a loan or loans not exceeding one

million of dollars in all, on the most favorable terms that in their judgment can be obtained. Suppose, to negociate the loan, the Governor and Treasurer should find it necessary to sell the bonds of the State at ninety cents on the dollar; would they be authorized, after having sold bonds to the amount of a million, and received $900,000 only, to issue as many more bonds as might be necessary to bring into the State Treasury $1,000,000 ? Most clearly not; and if not, then the loan is the sum the State agrees to pay, and not the sum it receives.

The company in its first reports to the Auditor General seems to have understood the word *loans* in this sense. And so it appears to be understood by Mr. Barhydt, one of complainant's witnesses, and by the company, if we are to judge of its understanding from the entries in its books. Mr. Barhydt, in his answer to the first direct interrogatory says, "he can not answer of his own knowledge, but he says he has examined the books kept by said companies, and from information derived from said books, he states upon his belief, that the entire amount of loans made by the M. S. R. R. Co., at the date of consolidation, was two millions five hundred thousand dollars, which loans appear by the course of entries in said books to have been made for the purpose in the first part of this interrogatory mentioned." That is, for the purpose of constructing said railroad, &c.

In regard to the $250,000 Jackson Branch bonds, they are not only a part of the $2,500,000 loaned to the company, but the allegation in the bill relative to them is not sustained by the proofs. The bill states that one of the officers of the Michigan Southern Railroad Company, without authority from the corporation, handed over these bonds to a person interested in the Chicago and Mississippi Railroad Company, on the promise of said person to return them, he giving out and pretending that he desired them only temporarily to pledge, as collateral security, for a

loan to aid in the construction of said latter company's road; that the bonds have not been returned; that they are. in the hands of *bona fide* purchasers, and that the company has not realized any thing from them. Mr. Barhydt gives the following entries relating to these bonds from the books of. the company.

"*Bills Receivable,*                 *Dr.*

"February 23, 1854.

"To mortgage bonds Jackson Branch, obligation of H· Dwight, Junior, dated October 15, 1853, payable July 4, 1855, with interest payable semi-annually, principal or any part payable in bonds, either Michigan Southern or North- ern Indiana Railroad at par, at option of payer: 250 bonds, Nos. 1 to 250 both inclusive, $250,000; collateral security for the above note of H. Dwight, Junior, $337,000, second mortgage bonds of the Chicago and Mississippi R. R.

"Chicago and Mississippi Bonds to Bills Receivable.

"July 13, 1855.

"To 300 bonds of $1000 each, second mortgage Chicago. and Mississippi R. R., numbered as per bill of sale on file, taken from H. Dwight, in payment of his obligation for $250,000."

From these entries it appears the bonds were sold on the 15th October, 1853, to Henry Dwight, Junior, for $250,000, to be paid for on the 4th July, 1855, with in-. terest payable semi-annually; the principal or any part thereof, at the option of the purchaser, to be paid in Michi- gan Southern or Northern Indiana Railroad bonds at par: that Dwight gave his note or obligation for the $250,000, and $337,000 of second mortgage bonds of the Chicago and Mississippi Railroad Company, as collateral security for the payment of his note or obligation. And that on the 13th July, 1855, $300,000 of these bonds were taken from Mr. Dwight, in payment of his note.

The next two sums, $466,848,02, cost of steamers, and $300,000 lent to the Chicago and Mississippi Railroad Com-.

pany, it is claimed should be deducted from the amount of capital stock and loans. The first sum because one of the steamers has been lost by fire, and the others, since the consolidation, have not been used and employed within the State of Michigan, but in other States, and are there taxed. And the $300,000 because the same has been lost by the failure of the Chicago and Mississippi Railroad Company.

To this part of the bill, as well as to all other claims for deduction to be made from the company's capital and loans, for any cause, there is a very short and conclusive answer, viz: that the Auditor General is not authorized by law to make any deduction whatever, while it is made his duty to levy the tax on the whole amount of the company's capital stock paid in, and all loans made to the company for constructing its road. This is also a sufficient answer to the $60,136,37 deduction claimed for commissions and expenses in negociating its loans.

The third section of the act authorizing the consolidation of the two companies, it was held, in the case in 4 *Mich.*, and I think correctly, did not change the principles of taxation on that part of the consolidated company's road in the State of Michigan. I think the decree dismissing the bill should be affirmed.

MARTIN CH. J. concurred with MANNING J.

*Decree affirmed.*