BOARD OF COUNTY COMMISSIONERS OF HENNEPIN COUNTY
v. COURTLAND N. DICKEY.[1]

May 29, 1902.

Nos. 13,008—(48).

### Clerk of District Court—Recovery of Fees.

Previous to 1891, the emoluments of the clerk of the district court of Hennepin county were established by a special-fee schedule. In that year this officer was given a fixed salary in lieu of all perquisites which he had been allowed before that time, and was after that required to turn over to the county treasurer all fees collected by him in his official capacity. Under the system thus adopted, the furnishing by the clerk of unauthenticated statements to commercial agencies and abstract companies made from an examination of the files and records in his custody during office hours was within the purview and scope of his official employment, and he was not authorized to appropriate to his own use emoluments realized therefrom. The fact that the county attorney had advised the board of commissioners that compensation derived from statements furnished to abstract companies and commercial agencies, containing information from the files and records in the clerk's custody, was not a part of the emoluments of the office, but belonged to the clerk, and the further fact that the county commissioners acquiesced in such advice and neglected to interfere with the appropriation of such sums by the clerk, did not estop the county from collecting the same by suit.

Appeal by plaintiff from a judgment of the district court for Hennepin county, entered pursuant to the findings and order of Elliott, J. Reversed, and new trial ordered.

*W. B. Douglas,* Attorney General, *F. H. Boardman,* County Attorney, and *Wm. C. Leary,* Assistant County Attorney, for appellant.

*Wm. A. Lancaster,* for respondent.

LOVELY, J.

This is an action by the board of commissioners of Hennepin county to recover from the clerk of the district court moneys which it is claimed he has appropriated to his own use in violation

[1] Reported in 90 N. W. 775.

of law. It was tried to the court, who found for the defendant. Judgment was entered in his favor, from which plaintiff appeals.

From 1876 to 1891 the compensation of the clerk of the district court of Hennepin county was regulated by a schedule of fees designated in statutes in force during that time. Sp. Laws 1876, c. 207, § 5; Sp. Laws 1881, c. 408, § 2; G. S. 1894, § 5542. In 1891 the legislature fixed the salaries of the register of deeds, clerk of the court, and sheriff at stated amounts (the clerk to have $4,000 annually), which were to be in full compensation for all services "rendered by these officers in their official capacity." Under this law, on the first Monday of each month such officers were required

"To file with the county auditor a full and detailed statement of all business done * * * and fees received * * * and amount of fees, if any, due and unpaid for the preceding month."

They were also to give the name of every employee in their offices, and the amount paid to each for services, with the general nature of the service, and were required to pay over to the county treasurer all fees received. These officers were also required to employ sufficient help to discharge the duties of their offices, but the number of deputies and the compensation to be paid to the deputies of the clerk were under the control of the board of county commissioners, who were authorized to make such changes in their number and compensation as they deemed just and right. A failure to pay over "fees and revenues" collected subjected the delinquent officer to removal, and was declared to be a felony. Sp. Laws 1891, c. 373, §§ 2–6. The fees for official services of the clerk, according to the schedule previously adopted, were not changed, but have been continued in force ever since.

Respondent has been the incumbent of the clerk's office since January 1, 1891. After he took possession he continued a practice previously in vogue, to furnish daily reports to abstract companies and commercial agencies located at Minneapolis. These reports were made upon printed blanks prepared for that purpose. They contained the title of suits commenced, amounts involved, as well as judgments entered and docketed, derived from an examination of the files and records, and comprised the knowledge useful in

furnishing abstracts of title and commercial reports. The work of furnishing these reports was performed during office hours very largely by the salaried deputies. They were given out at stated times each day, but without authentication. The time occupied daily in preparing these statements was not more than forty-five minutes. For this work the clerk received during the six years previous to the commencement of this action a compensation agreed upon between him and those to whom the statements were furnished, aggregating several thousand dollars, which he has retained.

It is appropriate in this connection to state that, soon after the clerk entered upon his duties, a question was raised before the board of commissioners regarding his right to appropriate these moneys, when the opinion was furnished, upon request by the board, from the county attorney's office, that he was entitled to do so, and the board, relying upon such advice, took no further action in the matter. Under the pleadings it was claimed at the trial that the clerk had in two instances retained sums for services provided for in the fee bill. The trial court found in his favor upon these issues, and from an examination of the record we are required to sustain its findings in these respects. It is also proper here to state that the representatives of the county do not censure the respondent for bad faith or actual corruption. What the clerk did was not done secretly. At the trial he manifested a commendable disposition to furnish all the information desired by appellant in respect to his official acts. He was the only witness examined, and it is not apparent that he attempted to withhold any information he could give. It is therefore but just to presume that the moneys claimed to have been wrongfully appropriated by him were retained under an honest impression that he was entitled to the same as a legal right.

The general intent of the act of 1891 is not obscure or in dispute here. The previous existing fee schedule was still to continue and be the gauge or measure of compensation for the clerical duties provided for therein. These fees were to be collected and paid into the county treasury. From this source the county derived a revenue taken from the clerk, but in lieu thereof he was to be

paid ·a fixed salary. His perquisites from fees for official duties were ended; these belonged to the county. His salary took their place, and with this he had to be content. But it is claimed that the moneys received by respondent for the statements furnished to the abstract men and agencies were not "fees," as that word is properly understood; that "fees" are compensation for particular acts or services rendered by public officers in the line of their duty, as expressly designated and authorized by law. This claim as thus abstractly stated is correct as far as it goes, yet we must still consider whether the clerk could appropriate to his own use emoluments for services not within the provisions of the fee schedule, without reference to their essential character, simply because not mentioned therein. The act of 1891 prescribes in terms that the clerk's salary shall be in full for all services rendered in his "official capacity." It would therefore seem necessary to determine whether the fee bill furnishes a sufficient criterion of the clerk's legal duties, and hence is an invariable test of "official capacity," whereby the right to retain or turn over any compensation he receives is to be tested.

The Hennepin county fee bill before the commutation provided in the salary act could hardly be regarded as furnishing the sole standard of official obligation imposed upon the clerk by law. It is true that this schedule established the emoluments of the office. In this respect the clerk was controlled by it. It was also a protection to the public against improper charges and unlawful exactions, but a very slight application of reason to existing conditions will show that it could not have been regarded as the sole measure of "official capacity" or the limit of the legal burdens imposed upon the clerk. We shall find upon investigation numerous instances in our procedure statutes where duties are imposed upon clerks of courts, yet we will not discover in this or other fee bills express requirements that such officers shall do any act whatever, so that, if these schedules are to be regarded as tests of duty, it must be for the reason that such duties are implied because compensation is provided therefor. That duties are implied from their recognition in a fee bill may be true, but if we were to go to fee schedules to ascertain from that source alone

when the clerk acts in an official capacity, we shall also find that in material respects they are inadequate. For illustration, no compensation is prescribed in the Hennepin schedule, either for writs of attachment or for executions, but it would be absurd to conclude that the duty to issue the mesne process of attachment or the ultimate process by which judgments are made effective could be declined by the clerk because no remuneration had been provided therefor in a fee bill. Such an inference would justify the cynical criticism that "the court's decrees" and the "strong statutes" were "as much in mock as mark."

A more critical examination of the Hennepin schedule will disclose other omissions to recognize important clerical duties, but what has been referred to seems sufficiently to show that the clerk's duties are not to be tested merely by statutory provisions for the payment of fees. Pertinent to this view, we find no statutory requirement that the clerk shall keep open his office, nor a provision regulating the hours when it shall be kept open for the transaction of business. That his office must be kept open is obvious. Also that it is to be open during the business hours of the day, when either the clerk or a deputy shall be in attendance, is a very reasonable inference; and, while there is no provision that the clerk must obey all proper directions of the presiding judge, it cannot be doubted that he must do so; and any comparison between the duties for which fees to officials are specifically provided and those which are implied will show that implication is the rule, express requirement the exception.

The legislature has already imposed, and may likewise hereafter impose, upon public officials, among them clerks of court, duties for which no emoluments are prescribed. Such duties cannot be evaded upon the claim that fees are not specifically designated therefor; since the reasonable view is well settled by the decisions that the emoluments allowed to a public officer under a fee system of compensation constitute the sole remuneration he is to receive for his entire official services. Mechem, Pub. Off. § 862, and cases cited; State v. Smith, 84 Minn. 295, 87 N. W. 775.

Unquestionably, officials are responsible public agents, who

must subserve public interests; and no duties enjoined are more weighty than many imposed upon court clerks, who are intrusted with the absolute control of records of the highest importance; and it has always been the object of the law not only to have such records open at proper times for public inspection, but to require suitable aid from their custodians in giving reasonable aid to all who need information therefrom. Hence it would follow that the giving of information, by the clerk or his salaried deputies, during office hours, which requires examinations, and, as incident to this work, written statements of the results, is in its very essence and character official, and not personal to the officer, upon any fair and reasonable view of what appertains to the duties of the office.

But if we restrict our investigation from what is generally implied by the duties of the office by the specific provisions of the Hennepin fee bill itself, we shall discover other rational grounds for the conclusion that the services of the clerk to the agencies and abstract men as here rendered were official in their nature and scope. A designated fee is provided therein for "copies and exemplification of records and of pleadings." While the statements to the agencies and abstract men were not strictly copies, yet this provision indicates a necessity for information which copies from the files and records would be calculated to afford. Again, it is provided that the clerk shall have for every certificate furnished a specified fee. While no certificates to these statements were requested, or, in fact, attached, yet statements over certificates could have been demanded, and the clerk would, under the implied obligations required by the fee bill, have been bound to have given them. While we would not hold that the statements furnished technically fall within either of these specific provisions for fees, yet the purposes for which they were intended indicate the objects sought thereby, and characterize the services actually rendered as official. But there is still a further provision in this fee bill more directly applicable to the duties which were actually performed by the clerk. A charge is authorized "for searching the records or files  *  *  *  if a copy is not required." It would seem to be thus implied beyond cavil that the duty to

make a search by the clerk and the giving out of information derived thereby is embraced in these terms by as strong an inference as gave him a perquisite before the salary act for any other duty.

We are unable to give force to the suggestion that the transcription from legal documents or from the files as made up from time to time did not require a search, nor can we force a distinction between such searches and the examination required to make the statements to the abstract men and agencies upon the theory that a search involves the looking for something that was not previously known, but would have to be found. Such may be a narrow and technical construction of the clerk's duties, but it is not a reasonable one. If such officer were permitted to deal either with the county, or with the person seeking information, wholly at arm's length, he might under dictates of self-interest reach this conclusion, because he was asked to rely upon that which he previously knew. But such an interpretation would likewise, upon this technical view, forbid him to charge a fee where he had to turn to the records or files to find the entry of a judgment or a suit of which he had knowledge at the time, which view would be absurd. The word "search" as thus used in the schedule should be treated as the equivalent of any examination the clerk must make to give an accurate report thereof; and to say that such examination is not a search within the intent of the fee bill is but the merest quibble.

We must not fail to give full significance, in dealing with the questions presented, to the efficient results of the salary act, and the changed relations between the clerk and the county effected thereby. It is quite clear from the very terms of this act that the county was to have all emoluments for the clerk's official services, or which could be reasonably obtained by a faithful administration of the office. Conceding that the clerk might have waived his own right to claim a fee before this act, or could render services for less than scheduled rates, he had no right to do so thereafter, but for every service reasonably suggesting compensation it was then his duty to demand the full remuneration allowed

86 M.—22

by law.  While respondent may not, perhaps, be criticised for furnishing the statements in the form and manner given to the agencies and abstract companies, yet he could not by a short cut or business arrangement of his own pursue a course that would dispense with copies or certificates, when such useful means might be an essential prerequisite to securing the knowledge desired by persons seeking the same.  If copies, certificates, or searches, where no copies are made would within any fair intention or expectation provide a means by which services of the clerk would be given to secure legitimate ends, payment ought not to be evaded by any plan that would deprive the county of its revenues to create perquisites for himself.  He had no right to seek for or obtain perquisites for such duties, nor to appropriate to himself emoluments which the fee schedule required him to collect for the county.

It is said that the information furnished in the statements from which the clerk derived the personal compensation sought to be recovered in this case might have been obtained without his assistance.  It must, however, be apparent upon the surface that persons outside the clerk's office could not practically have obtained this information in the manner it was furnished—at stated periods each day—nor with the assured expedition and accuracy as in the way it was given.  It must be easily presumed that this was the view of the abstract men and the agencies themselves, when contracting for the same.  There is no question as to the purpose for which this information was sought.  It was to sell the same by those who obtained it, but its sale to third parties also affected the income of the clerk's office, and it is but a reasonable view, as we held in the recent case of State v. McCubrey, 84 Minn. 439, 87 N. W. 1126, that the clerk of the district court may demand of applicants to inspect the records their purpose in doing so, to ascertain whether to complete abstracts to which abstractors can themselves attach a certificate and charge therefor, or for some other lawful purpose, and to refuse an inspection where its obvious and necessary tendency is to diminish the clerk's income.  The same rule would surely apply where this course. would affect the revenues of the county, and it is also readily

conceivable that the abstract men and agencies could not have demanded or received, at all specific times desired, accurate information from the files and records, for it would be the manifest duty of the clerk under any view to regulate their use by the rights of the entire public, and particular interests would be obviously encumbered with difficulties that could be overcome in no practical way without the efficient assistance of the clerk or his salaried deputies.

We are therefore required to adopt the conclusion that a proper legal view of the clerk's duty to deal with the money thus received for the statements furnished to the abstract men and agencies must be determined against his asserted rights to appropriate the same to his own use, upon the considerations that such statements were furnished in his official capacity, and that it was likewise the interest and the clear right of the county to have the compensation received therefor turned into its treasury; and it is of no significance that the specified fees provided for in the schedule for searches were not in terms exacted, or even that more than legal fees had been received by the clerk; for, such services being official in character and having been voluntarily paid, whatever was so paid became a resource of the county, and not a perquisite of the clerk. But, if any question could arise as to the correctness of charges thus made, it would be of no avail to the respondent, nor could he take advantage of mistaken rights in this respect. This would be a question to be settled between the persons paying for the services and the county. Placer Co. v. Astin, 8 Cal. 304; McKee v. Monterey Co., 51 Cal. 275; People v. Bunker, 70 Cal. 212, 11 Pac. 703.

Finally, it is most seriously insisted that the advice of the county attorney and the acquiescence therein by the board of commissioners amounted to a contemporaneous construction of the clerk's duties of such binding force as to estop the plaintiff from maintaining this action. Conceding that the county attorney could advise the commissioners upon the right of the clerk to retain the revenues in question, it must be conceded that neither the county attorney nor the commissioners were authorized to audit his accounts. The law made it the clerk's abso-

lute duty to turn over to the treasurer all revenues collected, and prescribes nowhere that his duties in that respect shall be under the supervision of the county board. It is true that the board, upon their knowledge of his course, should have instituted proceedings to prevent its continuance, and to collect the moneys improperly withheld. They have now done so. That they failed to do this before upon the advice of reputable and able lawyers does not, however, change the essential character of unlawful acts which have deprived the county of resources that should have been made available to its use. That the clerk's services in furnishing these statements were official, and that the money appropriated by him should have been turned into the treasury, seem to us very clear; that this result was not as apparent to the law officers of the county or the board of commissioners is regrettable. But to hold it a conclusive bar against the rights of the county to now recover it is to give to the views of legal advisers and the omissions of the county board a greater weight than is consistent with any proper view of legal responsibility in such a case. The legislature had enacted the law governing this subject, and it is for the courts, rather than legal advisers, to determine questions of its ultimate construction.

Underlying the views appropriate to this subject is due appreciation of the best interests of the public upon comprehensive ideas of necessity and wise policy. It is of vital importance to the welfare of the commonwealth that its servants be imbued with a genuine civic spirit. The inherent and manifest object of all statutes imposing responsibilities upon the servants of the government presupposes the necessity of that spirit, and seeks to secure its beneficent application in the public service. No theory is to be tolerated that permits the insidious vice of apathy to the interests of those who are served, or encourages by officials an importunate insistence in obtaining personal advantages to the public servant himself, for a public office is not to be treated as "a private snap."

Without question, the state desires from all its servants the same fidelity to its interests that characterizes the actions of the capable man of affairs. Such a person illustrates in his own

behalf the practical relation of master and servant, although this relation involves somewhat adverse obligations; yet such person is his own master as well as his own servant; he exacts from himself that devoted regard for his own interests that the master does from an employee, still he serves himself with the faithfulness which the good servant displays under the watchful eye of the master. The public servant is in a measure relieved from constant scrutiny of supervising authority; he enjoys to a large extent the independent privilege of being his own master and his own servant; but it is unquestionably expected of him, in the dual relation of master and servant in the public employment, that he should realize all the responsibilities of both. It must not be forgotten that he is at all times a public servant, and it should likewise be remembered that he stands in the place of the state, whom he represents, to require of himself as its servant that which the master he represents has a right to demand. He may not say that because there is no strict surveillance over his official work it can be slighted, ignored, or misdirected; nor can he be allowed to place an interpretation upon his official functions that would not be authorized if, instead of a political entity, the state were a sentient being, under whose continual observation he performs his daily duties; so, where questions of doubt arise between his own interest and that of his official master, the law looks with jealous solicitude to any omission of his to assert the rights of the public, and we ought to be extremely loath to yield to the claim that an incorrect construction of any legal duty by a public servant can be excused, upon the advice of other servants, or that the neglect of the latter to assert the same should establish a benefit by which illegal acts can be excused or condoned.

The advice of the county attorney to county officials is to aid in reaching correct and proper conclusions, not to excuse error and misconduct. Such advice was incorrect in this instance, the clerk derived substantial benefits thereby, which he now retains; but to allow him to persist in such retention would sanction one error by a greater one, and allow the mistakes of a subordinate legal adviser to nullify the acts of the legislature and foreclose the deliberate judgment of the courts. If the repayment of these

funds is any disappointment to respondent, we can only say, that he held the office cum onere, its benefits with its burdens, which is the undoubted tenor of all public employment.

It is the well-settled doctrine in this country, founded upon the most substantial dictates of reason and sound policy, that the government cannot be affected by the laches of its agents, or estopped from asserting its rights against an official servant by the acts or omissions of auditors, trustees, supervisors, or other guardians of public rights. Story, Ag. § 319; Mechem, Pub. Off. § 924; Seymour v. Van Slyck, 8 Wend. 403, 422; U. S. v. Kirkpatrick, 9 Wheat. 720; U. S. v. Van Zandt, 11 Wheat. 184; Gibbons v. U. S., 8 Wall. 269, 274; Day v. State, 68 Tex. 526, 4 S. W. 865; Conwell v. Voorhees, 13 Ohio, 523, 533.

A leading case cited to support the contention that the advice of the county attorney and neglect of the commissioners to assert the rights of the county should control this question is U. S. v. Hill, 120 U. S. 169, 7 Sup. Ct. 510. This decision goes as far as any to recognize the rule that a course of conduct by government agents may relieve a public officer from liability upon the ground that its long continuance amounted to a contemporaneous construction of the law, but it is of no efficacy to support defendant's claim, and is valuable principally in indicating the limits beyond which the doctrine will not be extended. In this case for many years the clerk of a federal court had been in the habit of examining applications for the naturalization of aliens. Such applications were required by the court to be filed with the clerk, who was to report when he had examined the same to see if they were in conformity with law. Such services so rendered were not the duties of the clerk, and did not pertain to his office. They could have been performed by any person designated by the court for that purpose, as an attorney or other suitable person. This had been of great advantage to those seeking to be admitted as citizens, intended to simplify the process and to make it more expeditious and inexpensive. The clerk had for many years charged a fee for this service; it was included in no schedule. The clerk's course was known to the court, who was required to examine and certify the correctness of his accounts, and had done so; they had

also been passed upon their merits by the treasury department. It was held that the contemporaneous construction of the federal judges and the officials of the treasury department was of sufficient weight, in view of the nature of the services, to relieve the clerk from liability. A careful examination of this opinion leads to the conclusion that, had the services been in their nature official, the fees would have been held recoverable, but because they were not of that character, and were approved by the judge of the tribunal in which the same were supervised, these facts were of controlling weight.

We have found no case, and we do not think any can be found, that will sustain the claim that contemporaneous construction is of importance to excuse a public officer from accounting for money received in his official capacity, or that goes further than to hold that, where the interpretation of duties is doubtful, contemporaneous construction will be entitled to potent weight in determining the existence of a legal right. That contemporaneous construction is of itself sufficient to overcome the plain behests of lawful duty is opposed to reason, and unsupported by precedent (State v. Smith, 84 Minn. 295, 87 N. W. 775); and we must hold that the acquiescence of the county commissioners, and the legal advice received by them, cannot protect respondent.

The judgment is reversed, and a new trial ordered.