## PEOPLE v. DETROIT, GRAND HAVEN & MILWAUKEE RAILWAY CO.

1. STATUTES—CONSTRUCTION—INTENT TO GOVERN.

> The primary object in the interpretation of statutes is to determine the intent of the legislature as it may be gathered from reading the entire act; its manifest intent must prevail over the literal sense of terms.[1]

2. TAXATION—STATUTES—SPECIAL CHARTER CONSTRUED—PRACTICAL CONSTRUCTION GIVEN BY ALL PARTIES BINDING.

> In a suit by the people of the State of Michigan against defendant railway company to determine the basis of taxation of defendant as fixed in its special charter (section 9, Act No. 140, Laws of 1855) which is in the nature of a contract between the State and defendant, the construction placed upon said section by the administrative, legislative, and judicial departments of the State government, viz., that the tax was intended by the legislature to be based upon the amount of its capital stock paid in, rather than upon its capital investment or property owned, *held*, binding upon the courts although defendant is thereby allowed to escape from paying its just share of public taxes.[2] BIRD, J., dissenting.

3. STATUTES—COURTS INTERPRET RATHER THAN MAKE LAWS.

> Courts cannot make laws; they can only interpret them in conformity with legislative intent.[3]

Appeal from Kent; McDonald (John S.), J. Submitted January 26, 1923. (Docket No. 75.) Decided October 30, 1924.

Bill by the people of the State of Michigan against

[1]Statutes, 36 Cyc. pp. 1106, 1107, 1128; [2]Corporations, 14A C. J. § 2111; Statutes, 36 Cyc. pp. 1141, 1142, 1144; [3]Constitutional Law, 12 C. J. § 387.

The different phases of taxation of capital stock of corporations in the United States are discussed in a comprehensive note in 58 L. R. A. 513; specifically, as to construction of statute relating thereto, see page 609 of above note.

the Detroit, Grand Haven & Milwaukee Railway Company to determine the basis upon which defendant should be taxed under its special charter. From a decree dismissing the bill, plaintiff appeals. Affirmed.

*Merlin Wiley* and *Andrew B. Dougherty,* Attorneys General, and *Clare Retan,* Assistant Attorney General, for plaintiff.

*Harrison Geer* and *H. R. Martin,* for defendant.

SHARPE, J.   The Detroit & Pontiac Railroad Company was incorporated by an act of the territorial legislature in 1834 and the Oakland & Ottawa Railroad Company by an act passed in 1848. A connection between these roads was provided for in Act No. 96, Laws of 1850. By Act No. 140, Laws of 1855, the name of the latter was changed to the Detroit & Milwaukee Railway Company and it was authorized to purchase the property of the former. Section 9 of this act reads as follows:

"The said company shall, on or before the first day of July, pay the State treasurer an annual tax of one per cent. on the capital stock of said company paid in, which tax shall be in lieu of all other taxes, except for penalties imposed upon said company by its act of incorporation, or any other law of this State. The said tax shall be estimated upon the last annual report of said corporation."

Act No. 96, Laws of 1859, provided that purchasers on foreclosure sales of railroad property might continue operations under the charter and laws applicable thereto and might issue new and additional stock to themselves. A foreclosure sale of the property of the Detroit & Milwaukee Railway Company was afterwards had and a reorganization perfected under the present name of the defendant company.

In this proceeding we are called upon to place a construction upon the taxing provision contained in section 9 above quoted. It is the claim of the plain-

tiff (the State) that the tax should be estimated upon "the capital investment" of the defendant, while the defendant contends that the words "capital stock paid in" have a definite meaning: that they mean "the moneys or property paid in by the shareholders on account of their stock." It is conceded that the par value of the outstanding stock was $2,517,140 and that the value of defendant's property was upwards of $8,000,000 at the time this suit was tried. The trial court was inclined to agree with. the State in its interpretation of the statute but held that—

"the practical construction given to the provisions of this contract by the State and by the railroad company and so long continued is decisive of the legislative intent in respect to the basis of taxation."

From the decree entered dismissing the bill plaintiff appeals.

The rights and liabilities of the defendant under Act No. 140 have been the subject of much litigation. In *Attorney General* v. *Joy*, 55 Mich. 94, decided in 1884, the State by *quo warranto* assailed the defendant's right to exercise and use the franchise under which it assumed to be acting. It was held that the defendant company was possessed of all the rights and privileges granted to the Detroit & Pontiac Railroad Company under said act, and that a binding contract was created thereby. A petition for a rehearing, filed in 1914, was denied (181 Mich. 266). In *People, ex rel. Attorney General,* v. *Railway Co.,* 157 Mich. 144, the validity of defendant's special charter was again attacked and sustained, and in the case decided with it, one to collect a tax from defendant in disregard of the statute, the judgment of the lower court in favor of defendant was affirmed. Somewhat similar questions were raised and decided adversely to the State in *Powers* v. *Railway Co.,* 201 U. S. 543 (26 Sup. Ct. 556). These cases will hereafter be referred to.

The primary object in the interpretation of statutes

is to determine the intent of the legislature as it may be gathered from reading the entire act. "Its manifest intent must prevail over the literal sense of terms." *Township of Stambaugh* v. *Iron County Treasurer*, 153 Mich. 104, 107.

The claim of the State that the words "capital" and "capital stock" are frequently used synonymously, particularly in tax statutes, is supported by abundant authority. In 1 Desty on Taxation, § 74, it is said:

"Capital and capital stock are in legal intendment synonymous, and are used in legislative acts as equivalent terms, though strictly not of the same meaning. Capital stock means not shares of stock, either separately or in the aggregate; but is intended to designate the property of the corporation subject to taxation, not in separate parcels, but as a homogeneous unit, partaking of the nature of personalty, and subject to the burdens imposed on it, at the domicile of the owner where it exercises its corporate functions, and where its business is done."

See, also, Burroughs on Taxation, p. 142; 1 Elliott on Railroads (3d Ed.), § 90; 1 Cook on Corporations (8th Ed.), § 8; 2 Clark & Marshall on Private Corporations, § 375.

A tax upon the capital of a corporation has almost uniformly been held to be a tax upon the property in which the capital has been invested (*Bank Tax Case*, 2 Wall. [U. S.] 200), and the same construction has been placed upon a provision for taxing the capital stock. *Delaware, etc., R. Co.* v. *Pennsylvania*, 198 U. S. 341 (25 Sup. Ct. 669); *Wright* v. *Banking Co.*, 216 U. S. 420 (30 Sup. Ct. 242). Many State courts have so held. See exhaustive note in 58 L. R. A., beginning on page 514.

The language here employed is not "capital" or "capital stock," but "capital stock paid in." Counsel for the State urge that the words "paid in" were used simply to distinguish between the stock issued and that remaining in the treasury. They rely on the

rule that exemptions from taxation are not favored; that words creating them must be given the narrowest meaning which will fairly carry out the intent of the legislature. *East Saginaw Manfg. Co.* v. *City of East Saginaw*, 19 Mich. 259, 279 (2 Am. Rep. 82). Were this a recent act and had not a construction been placed upon the language here used, not only by the administrative but also by the legislative and judicial departments of the State government, we would be much impressed by this claim and the many authorities cited in its support.

An examination of the several acts of the early legislatures providing for the taxation of railroads is instructive. Sections 5 and 6, chapter 21, title 5, Revised Statutes of 1846, read as follows:

"SECTION 5. Every company heretofore incorporated or hereafter to be incorporated within this State, for the purpose of constructing and using any railroad, canal or turnpike therein, shall pay a yearly tax to the State of three-fourths of one per cent. on the amount of the capital stock of such company paid in or secured to be paid, which tax shall be paid into the State treasury by said corporations respectively, on or before the first Monday of October in the year one, thousand eight hundred and forty-seven, and in each year thereafter.

"SEC. 6. Such tax shall be in lieu of all State, county, township or other taxes in this State, on the capital stock of said corporations, and on the railroad, canal or turnpike constructed or used by any such corporation, and on all the real and personal property in which said capital stock shall be invested, and which shall be used and occupied by any such company, in accordance with the provisions of its charter, and the laws of this State, in the construction or use of such railroad, canal or turnpike."

Section 45 of Act No. 82, Laws of 1855, a general statute providing for the incorporation of railroads, reads:

"Every corporation formed under the provisions of this act, shall, on or before the first day of July, pay

the State treasurer, an annual tax of one per cent. on the capital stock of said company paid in, which tax shall be in lieu of all other taxes upon the property of said company, whether real, personal, or mixed, except penalties by this act imposed; the said tax shall be estimated upon the last annual report of said corporation, but nothing contained in this section shall apply to any existing corporations."

The similarity of the language in this provision and that contained in the special act under consideration, enacted at the same session, will be observed.

This section was amended in 1869 (Act No. 142, Laws of 1869) to read as follows:

"SECTION 45. Every corporation formed under the provisions of this act shall, on or before the first day of July, in the year one thousand eight hundred and sixty-nine, and annually thereafter on or before the first day of October of each year, pay to the State treasurer, on the statement of the auditor general, an annual tax of one per cent. on the capital stock of said company paid in, and also upon all sums of money, whether arising from the net proceeds of said road, from municipal aid, from the sale of lands, or from other sources, as shall from time to time be invested in the original construction and stocking or in any new construction or stocking of said road, which tax shall be in lieu of all other taxes upon the property of said company, whether real, personal, or mixed, except penalties by law imposed; and such tax shall be estimated upon the last annual report of said corporation filed in the office of the auditor general, as required by section thirty-two of this act; but nothing contained in this section shall apply to any corporation existing at the time of the approval of the act of which this is amendatory, nor to alter, reduce, or in any way affect the tax of any corporation not formed under the provisions of said act: *Provided,* That no corporation formed under the provisions of the act to which this is amendatory, shall be liable to pay any tax on any money expended on any portion of its road which has not been opened for use."

This provision remained in force with but little change until 1873 (Act No. 198), when a law was

enacted providing for the taxation of railroads upon their gross receipts.

If the legislature of 1855 intended that the words "capital stock paid in" should mean the capital, capital stock, capital assets or the entire property of a railroad, as is now claimed by the State, the amendment in 1869, providing that in addition to the tax on the "capital stock paid in" it should pay a tax upon all other sums invested in the construction or stocking of its road, would have been entirely unnecessary. The following proviso to section 1 of Act No. 94, Laws of 1861, relating to the defendant road, reads:

\* \* \* *"Provided further,* That neither the foreclosure of the mortgage upon the road and franchises of said company, nor anything in the act in relation to mortgages against preferred stock in and delivery of goods by railway companies, approved February tenth, eighteen hundred and fifty-nine, or in this act, shall be construed in any way to affect or change the rule of taxation, as provided in the charter of said company, and which shall continue to be one per cent. upon the capital stock originally paid in, and upon such stock as may hereafter be paid into said company."

Section 26 of the act of 1848 (Act No. 234), already referred to, provided that the tax should be paid upon all sums invested in the Oakland and Ottawa road. The omission of any such provision in the act of 1855 can hardly be said to have been an inadvertence. The general law enacted in that same year contained a similar provision as to corporations organized under it.

The next action taken by the legislature was on the insistence of the governor. The fact that railroad corporations were paying less than their fair share of the taxes collected in the State had become so apparent that a special session was called and an urgent desire expressed by the governor that such inequality should be corrected. The repeal of the special charters

granted to the defendant and other railroad companies was urged, even though such repeals might result in actions for damages against the State. The statute providing for the repeal of defendant's special charter will be found in Act No. 5, Pub. Acts, Extra Session, 1900.

In an early day this court was called upon to interpret the meaning of the words "capital stock paid in" in other railroad charters. The first case was *People* v. *Railroad Co.*, 4 Mich. 398. The act under which that company was organized provided for the payment of an annual tax of three-fourths of one per cent. upon its capital stock paid in, including the purchase money paid to the State, and also upon all loans made to the company for the purpose of construction, etc., and exempted all of the other property of the railroad from taxation. The question arose upon the taxation of a part of its capital stock paid in "not actually employed" by it in the State of Michigan. The defendant claimed the right to deduct an item of bonus paid on the sale of some of its stock and also the amount of certain bonds issued in exchange for those of another company which had not been disposed of. The opinion is instructive. We quote but one sentence:

"It is apparent that the legislature regarded all the capital stock paid in, and the loans made to the corporation for the purposes authorized by the charter, as "actually employed," whether actually expended in building the roads, etc., or on hand for that purpose, in the form of money, bills of exchange, or bonds drawing interest."

In *Michigan Southern, etc., R. Co.* v. *Auditor General*, 9 Mich. 448, an interpretation was also placed upon these words. This case involved some of the same questions discussed and decided in the case just referred to. The right to deduct the value of steamboats destroyed by accident or lying idle within the

limits of another State was also considered. Mr. Justice CAMPBELL said:

"The law does not undertake to follow the money of the company to its several destinations. When once borrowed, the company * * * should be held responsible for taxes on it, whether spent profitably or not. * * * The bill shows the steamboats were a part of the original Michigan investment. They remain in specie the property of the company, except one which was destroyed. I do not perceive how the original investment has been altered. And, therefore, I think no deduction should be made from the tax on their account."

Mr. Justice MANNING said that the legislature probably intended that the company should pay a tax of three-fourths of one per cent. "on what the construction of the road should cost the company" and discussed how such cost should be arrived at. He further said:

"The company is required to pay a tax of three-fourths of one per cent. annually to the State on its capital stock paid in, and upon all loans to the company for constructing the road. * * * It was not intended to exempt from taxation stock which the company, for some imaginary or actual past or future benefit, or other cause, might think proper to dispose of without an equivalent in money. * * * The auditor general is not authorized by law to make any deduction whatever."

In Lake Shore, etc., R. Co. v. People, 46 Mich. 193, and State Treasurer v. Auditor General, 46 Mich. 224, the amount of the tax to be paid by the Lake Shore road was involved. In the former case the declaration was filed by Otto Kirchner, attorney general. The question presented was whether investments made from a part of the capital stock paid in and loans made, actually employed without the State, were taxable. It will be observed that in none of these cases, though the amount of the tax to be paid by the railroad company was involved, did

the State make any claim of a right to levy a tax other than on the capital stock paid in and loans made as the same should be determined from reports made in conformity with the statute.

The first effort made by the State to compel defendant to pay any taxes other than those for which it admits liability under the act of 1855 was in 1907. It then began the *quo warranto* proceeding to again test the validity of defendant's special charter and also filed the bill in equity in which the auditor general was complainant to enforce collection of a tax levied under the general law then in force, heretofore referred to. Both of these cases reached this court.   157 Mich. 144.   The claim of the State at that time as to the interpretation which should be placed upon the taxing provision under consideration here was thus stated in the bill of complaint:

"That the purpose and effect of the said provision for taxation was to require the payment of a tax upon the separate shares of the capital stock of the said corporation in the hands of their individual holders and owners, and to exempt from taxation the said shares in the hands of such holders and owners, but the effect of said provision for taxation was not to exempt from taxation the capital of the said corporation or its railroad or property or to create a contract between the State of Michigan and the said Detroit & Milwaukee Railway Company which would in effect exempt from taxation the said capital stock or road and property."

A decree was prayed for providing that the defendant company and its railroad and property be decreed—

"to be subject in all things to the general railroad laws of the State of Michigan and to Act No. 173 of the Public Acts of 1901, as amended, and its property liable to taxation thereunder."

And further:

"That in case it be determined that the said De-

troit, Grand Haven & Milwaukee Railway Company has or enjoys immunities or exemptions from taxation under the act of March 7, 1834, as affected by Act No. 140 of the session laws of 1855, that it then be decreed that such act and the exemptions from taxation therein contained"—

apply only to that part of the road constructed under the act of 1834. There was also a prayer for general relief.

In its answer the defendant denied the conclusions stated as to the effect of section 9 and averred that the purpose was to create a special contract to pay "an annual tax of one per cent. on its capital stock paid in" in lieu of all other taxes. It set up the different suits which had been begun against the defendant company in which its special charter was involved and the action of the auditor general in presenting a bill for taxes and receiving payment under the construction placed by the defendant on such section. And further:

"It further avers that by reason of the aforesaid recognition, sanction, ratification and construction, the complainant, and the State of Michigan represented by him, should be and is estopped to deny the application in full force of said contract relative to taxation."

In one of the briefs filed by counsel for the State in support of its claim as to the meaning of the term "capital stock paid in" it is said:

"Even if section nine is held to be a contract, and to exempt the capital stock in the hands of the corporation, still the taxes here involved should be sustained to the extent that they are levied upon the surplus or property of this corporation over and above the amount of the capital stock paid in.

"For, as said by the Supreme Court of the United States in *Bank of Commerce* v. *Tennessee*, 104 U. S. 493: 'The exemption is not greater in its scope than the subject of the tax.'

"The subject of the tax is the capital stock. The

capital stock paid in is shown by the record in this case to be the sum of $2,517,140. The assessed valuation of the property alleged in the 19th paragraph of the bill, and admitted in the answer, is, for the year 1903, $5,900,000."

A tabulation is then made showing that at the rate fixed the tax on the surplus over and above the capital stock paid in for that year would be $58,209.30.

In the *quo warranto* case the respondent was charged with unlawfully exercising certain franchises and privileges, to wit:

"4. The right, privilege, and franchise of perpetually paying the limited rate of taxation fixed by Act No. 140 of the Laws of 1855, to be paid and measured upon the capital stock of the Detroit & Milwaukee Railway Company."

Both of these cases were decided adversely to the State.

Counsel for the State lay much stress upon the language used by Mr. Justice Brewer in the decision in the *Powers Case, supra.* In 1901, the legislature, acting under the power conferred by a recent constitutional amendment, enacted Act No. 173, providing that railroad companies should pay an *ad valorem* tax, averaging that paid on all other property in the State, on the actual value of their property employed in their business in this State. The auditor general was preparing to levy a tax on the defendant under this law and it filed a bill in the United States district court for the western district of Michigan to enjoin him from doing so. The plaintiff was granted the relief prayed for in that court (138 Fed. 264) and on appeal to the Supreme Court the decree was affirmed (201 U. S. 543 [26 Sup. Ct. 556]). It was held that the question of the validity of Act No. 140 as a binding, irrevocable contract between the State and the railway company was *res judicata* because of the holding in the *Joy Case.*

The language used in this opinion must be considered in the light of the claims of the respective parties. That of the State was thus stated:

"Section 9 of the act of 1855 relates only to taxation upon capital stock paid in, and does not assume to exempt or limit taxation upon other property of the company."

It was argued:

"In view of the clear distinction between the stock in the hands of the shareholders, the capital stock, the property of the corporation, the surplus over and above the capital stock and the franchise, each may be regarded as separate and distinct classes of property, and the exemption, if one exists, be no further than the language clearly imports, viz., upon the amount of the capital stock paid in.

"But it is not the capital stock the State seeks to tax; it is the property of the railroad company; appraised at $6,195,000, while the amount of capital stock paid in, as shown by the bill of complaint is the sum of $2,517,140, showing property of the value of $3,677,860 in excess of the amount of capital stock paid in.

"Whether this excess is the result of accumulated earnings, or property produced by the sale of bonds, does not appear, but it is quite clear that it is a surplus and is the property of the corporation and subject to taxation, and it does not appear that any part of said capital stock paid in has been converted into the property taxed.    If it did so appear, then the exemption could only extend to the amount of the capital stock paid in."

In the 5th subdivision of the brief filed by counsel for the defendant company its claim is thus stated:

"The terms 'Capital Stock Paid In,' as used in the charter tax limit, extend to and mean the corporate property in which that stock is invested.

"*The company* is to pay this tax.    The words 'paid in' signify the capital amassed in the treasury.  There is no thought in this language of the *shares* in the hands of the *shareholders*.    It is capital collected, not capital distributed among the shareholders.    This ex-

tends to the corporate property represented by the capital and in which the capital is invested. *Railroad Co.* v. *Gaines*, 97 U. S. 697, 707; *Delaware, etc., R. Co.* v. *Pennsylvania*, 198 U. S. 354 (25 Sup. Ct. 669)."

In elaborating this argument, counsel, after referring to the difficulty of attempting to place a value upon railroad property because of its peculiar character, said:

"Therefore, in the presence of this difficulty it was agreed between the legislature and the company that the basis should be the total of the capital stock paid in.

"This was thought, and very properly thought, to represent the value of the property as being the amount of money spent in the land, work, labor, and material going to make up a railroad equipped for use. This was an elastic basis, for as new investments were made in new property the capital, and therefore the taxes, would be correspondingly increased. Instead of going to the property and valuing it in detail, the sum of money which produced that property is found and this is taken as a fair expression of that value. This is by no means an exemption. Exemption is a misnomer. It is a simple way of ascertaining the value. * * * Therefore we contend that the plan adopted was a convenient and an adequate expression of the entire value."

The court said:

"By section 9 the tax is 'on the capital stock of said company paid in.' Clearly that refers to the property which the corporation has received and presumably holds. It is not the individual property of the shareholders which is contemplated, but that which is in the treasury of the corporation, or included among its assets. This, as we have seen, is the ordinary meaning of the term 'capital stock.' Further, we find that this tax is to be 'in lieu of all other taxes, except for penalties imposed upon said company.' In other words, the tax upon the company of one per cent. may be increased by penalties imposed

upon the company, and in no other way. Again, the tax is to 'be estimated upon the last annual report of said corporation.' While such report might be expected to include not merely the property belonging to the corporation but also the number and names of the stockholders and the number of shares held by each, and possibly also the amount paid in by each, yet the word 'estimated' carries with it the idea of valuation rather than of mathematical apportionment. It suggests that the property reported by the corporation is to be the basis upon which the assessors shall make their valuation, so that the tax is 'estimated' upon that property rather than fixed by the mere process of multiplication or division. That the tax is to be paid by the company is of course not conclusive on the question, but it is in harmony with all the other provisions of the section. Still further, we have the practical construction placed by the authorities for a long series of years—continued up to the year 1898. Under those circumstances we are of opinion that the tax provided for by section 9 is a tax upon the property of the corporation and not a tax upon the shares of stock held by the shareholders. There was, however, a contract between the State and the corporation which prevented the subjection of the property of the corporation to any other than the tax prescribed in the statute."

The question here presented was not squarely before the court. In view of the position then taken by counsel for the State, that there is a "clear distinction between the stock in the hands of the shareholders, the capital stock, the property of the corporation, the surplus over and above the capital stock and the franchise," it cannot be assumed that the court intended to hold or even intimate that the words "capital stock paid in" included the property of the corporation as is here claimed. The court endeavored to point out that section 9 applied only to "the property which the corporation has received and presumably holds;" that which from the sales of its stock "is in the treasury of the corporation, or included among its assets," and not to the shares of stock in the hands

of its stockholders.   What was said, however, was mere *dictum* as it is conceded that the question here considered was not there presented, discussed or decided.

There is no question but that, except as to the years in which litigation was pending, the auditor general of the State prepared and sent to defendant a statement of the annual tax due on the basis of one per cent. on its capital stock paid in as shown by its last annual report, and accepted payment thereof as a full compliance by the defendant with the requirement of the statute.

We have, therefore, a construction placed on the words "capital stock paid in" as used in this act by the legislative, judicial and administrative departments of the State government and, if the language were capable of more than one interpretation, such construction, so long continued, would, under practically all the authorities, be conclusive of the legislative intent.   In *People, ex rel. Attorney General,* v. *Railroad Co.,* 145 Mich. 140, the statute under consideration provided for a fixed rate of taxation upon defendant's capital stock paid in, including the purchase money paid to the State and also "upon all loans made to said company, for the purpose of constructing said railroad or purchasing, constructing, chartering, or hiring of the steamboats authorized by this act to be held by said company," and exempted the property of the company from the payment of any other tax. The question presented was whether the moneys so derived, when invested in property lying outside the limits of the State, but used by the defendant as a part of its system, was subject to such tax.   It appeared not only that the auditor general of the State had accepted payment of taxes, on a valuation not including that so invested, for more than 40 years as a compliance with the requirement of the statute, but that by amendments to the act, approved by the

governor of the State, the construction thus placed upon it had been recognized.    In the majority opinion, written by Mr. Justice MONTGOMERY, it was said:

"We are of the opinion that the practical construction of the executive and legislative branches of government so long continued should be held decisive of the legislative intent."

Many authorities are cited by Mr. Justice GRANT in his opinion in support of this holding.

In *Wright* v. *Banking Co.*, 216 U. S. 420, 426 (30 Sup. Ct. 242), it was said:

"That this is the way in which it has been read and interpreted by everybody who has had to do with the matter of taxation in an official way since 1845, when the railroad seems to have been finished, affords strong evidence that this construction accords with the intent of the charter.    Aside from at least sixty years of legislative and executive acquiescence in reading this partial exemption as applicable to the capital stock of the company, there has been a series of cases decided by the supreme court of Georgia which involved the meaning of this clause.    In each case the court has held, either, that the whole of the capital was exempt in whatever form invested, or so much of the investment as corresponded in value to the authorized capital stock."

See, also, *Attorney General* v. *Lumber Co.*, 164 Mich. 625.

We have given due consideration to this case, fully appreciating its importance.    It is unfair and unjust that this defendant should be permitted to escape from paying a tax upon its property upon the same basis as that of other railroad corporations doing business in the State.    A greater burden is also thereby imposed on all other taxpayers in the State.    But courts cannot make laws; they can but interpret them in conformity with the legislative intent.    It should be borne in mind that the tax provided for in section 9 was the same as that then imposed on railroad corpora-

tions under the general law.   The advantage gained
by the defendant, and which has so greatly inured to
its benefit, has been due to the holding that the con-
tractual relation established by the act was not subject
to change by either amendment or repeal.   This was
settled for all time in the *Joy* and *Powers Cases,*
*supra.*

The decree is affirmed.

CLARK, C. J., and MOORE, STEERE, and WIEST, JJ.,
concurred with SHARPE, J.   McDONALD and FELLOWS,
JJ., did not sit.

BIRD, J. (*dissenting*).   I am unable to concur in
the conclusion reached by Mr. Justice SHARPE in this
case.

In 1855 the Detroit & Pontiac Railroad Company
and the Oakland & Ottawa Railroad Company were
consolidated by force of Act No. 140, Laws of 1855,
as the Detroit & Milwaukee Railway Company.   After
being operated for several years under this title its
name was changed by amendment to that of defend-
ant.   Defendant continued to operate the railroad
until it was absorbed, by ownership of stock, by the
Grand Trunk Railway Company of Canada.   The
Grand Trunk Railway Company of Canada operated
it as an independent corporation until that company
itself was absorbed by the Dominion of Canada.   By
reason of the ownership of defendant passing to the
Dominion, the real parties in interest to this contro-
versy are now the State of Michigan and the Dominion
of Canada.

The act of consolidation contained a taxation clause,
reading:

"SECTION 9.   The said company shall, on or before
the first day of July, pay the State treasurer an annual
tax of 1% on the capital stock of said company paid
in, which shall be in lieu of all other taxes, except
for penalties imposed upon said company by its act

of incorporation, or any other law of this State. The said tax shall be estimated upon the last annual report of said corporation."

The defendant railway was required to make an annual report to the State of the company's physical assets, its indebtedness, and certain other information. The statutory annual report was required to show, in part:

"1. The capital stock and the amount actually paid in;

"2. The amount expended for the purchase of lands for the construction of the road, for buildings, for engines and cars respectively;

"3. The amount and nature of its indebtedness, and the amounts due the corporation;

"4. The amount received for transportation of passengers, of property, of mails, and from other sources;

"5. The amount of freight, specifying the quantity in tons, of the products of the forest, of animals, of vegetable food, and other agricultural products, manufactures, merchandise, and other articles;

"6. The amount paid for repairs, engines, cars, buildings and salaries;

"7. The number and amount of dividends, and when paid;

"8. The number of engine houses and shops of engines and cars and their character;

"9. The number of miles run by passenger, freight and other trains respectively;

"10. The number of men employed and their occupation;" * * * 1 Comp. Laws 1857, § 1976.

There has been, from time to time, since the consolidation, much litigation between this railway and the State. Most of this litigation was initiated by the State for the purpose of avoiding the company's special charter in whole or in part, and is of no importance in this litigation except in a historical way. These efforts failed because the conclusions of the courts were that the special charter was a contract which the State could not avoid. When this question was

settled, the State then filed this suit in the latter part of the year 1910, praying for a construction of the taxing clause of the special charter. The State contends that the words "capital stock paid in" mean the capital investment or the property which the corporation has received and presumably holds. The position of the railway is that they mean the money paid in by the shareholders, which is represented by the paper shares. It appears to be undisputed that the paper shares have represented, since the consolidation, the sum of $2,517,140, with some slight variation during the years, whereas the value of the railway and its assets are now between $8,000,000 and $10,000,000. Since the consolidation the company has been paying $25,171.40 as an annual tax upon its theory that only the paper shares were taxable. Had it been paying on the theory of the State that its total investment was taxable, it would now be paying substantially $100,000 a year, and defendant's counsel estimates that had the railroad paid on the State's theory since the consolidation, it would have paid into the treasury of Michigan substantially $3,500,000 more than it has paid.

It may further be stated in explanation of the position of the State that it is not seeking to enforce any past delinquencies upon the part of the railroad. It is simply seeking a construction of the taxing provision for the purpose of furnishing a basis for future taxation.

The two questions which demand solution are:

(1) What meaning shall be given to the words "capital stock paid in?"

(2) By accepting payment on defendant's theory for several years is the State now estopped to estimate a tax on its present theory, if that theory be the correct one?

1. In construing this taxation clause it will be helpful to get as nearly as we can the view point of

the legislators of that session. The legislature was engaged in the work of joining two railway lines, which, when finished, would reach from the Detroit river to Lake Michigan. It was thought in those days that this line, in connection with a boat line, would furnish one of the principal lines of transportation between Detroit and Chicago. Of course, it was understood by the legislators that this railway was to traverse much undeveloped country, and that as the natural resources of the State were developed the business of the railway would increase and eventually become not only an important but prosperous line of railway. This is evidenced in part by the act of the legislature authorizing the railway to construct a double track line and increase its stock to $10,000,000. With this hopeful view of the future of this railway it created this taxing clause. It is hardly conceivable that with this outlook the legislature intended to fix a partial exemption of one per cent. on the then invested capital of $2,517,140, and, in addition, forever exempt from taxation all the property this railway might accumulate in all the years to come. To so hold would be to charge the legislature of that day with welding these two lines of railway into one and leaving the resulting corporation to fix its own tax base. This construction would have permitted the company to borrow money on mortgage bonds, improve its line and increase its value without increasing its tax base. I am unable to believe that the many able and eminent men who were members of the legislature of that session were guilty of such far reaching recreancy as to grant to defendant such an inequitable and unheard of privilege.

But aside from these considerations I think the language of the taxing clause shows on its face that the legislature intended that "capital stock paid in" should include the capital investment of the railway. If the words "capital stock paid in" be construed in

connection with the statutory duty of the railway to file annual reports and the provision of the taxing clause that the "tax should be estimated from those reports," it shows clearly that capital stock was intended to cover its entire capital assets. If defendant's theory be true that the paper shares furnished the base of taxation, there would be no need to estimate the tax, there would be no need for an annual report showing the assets of the railway, all that was necessary would be a computation of one per cent. on the capital stock of $2,517,140. During all the years which have intervened all the auditor has done has been to compute the tax on the paper shares, and if the railroad company has obeyed the law as to annual reports, it has each year done an idle thing, as they have served no purpose. This view ignores the purpose of compelling annual reports and renders meaningless the mandate that the tax shall be estimated from such reports.

It is quite evident that the succeeding legislature of 1859 did not construe the language in question to refer only to the paper shares, as the legislature at that session provided that if any mortgage was foreclosed on the consolidated company the purchasers might continue the operation of the road under the old charter, *and issue to themselves new stock in such amount as they might deem proper.* Act No. 96, Laws of 1859. Under this privilege the capital stock could have been reduced to $1,000,000 or $500,000, and its annual taxes would have been reduced to $10,000 or $5,000 instead of $25,000. It is morally certain that no such privilege as this would have been granted by the legislature to purchasers at mortgage sales if it had understood the basis of taxation was limited to the paper shares of the company.

Again, attention is called to the fact that the general law which permitted the incorporation of railways had a similar provision as to taxation (1 Comp.

Laws 1857, § 1989), and the specially chartered railroads also had similar provisions, and the attorney general very pertinently inquires why the State should grant to this railroad a more favorable exemption from taxation than it did to those organized under the general law and special charters, and he suggests that this is especially significant in view of the fact that the State had recently been in a legal controversy with the Detroit & Pontiac Railway over its refusal to pay its taxes. *People* v. *Railroad,* 1 Mich. 458.

Further, if defendant's construction be accepted it must be conceded that the legislature of 1855 granted defendant two exemptions, one by restricting taxation on its then invested capital to one per cent. and another by exempting all the property and value which it might thereafter accumulate. There is nothing in the act to indicate that the legislature intended to grant the second exemption. Upon this phase of the case some observations on exemptions by 2 Lewis' Sutherland Statutory Construction (2d Ed.), § 539, is not out of place:

"Legislation which is claimed to relieve any species of property from its due proportion of the general burden of government should be so clear that there can be neither reasonable doubt nor controversy about its terms. The language must be such as leaves no room for discussion. Doubts must be resolved against the exemption."

In view of the requirements of the taxing clause of the charter that annual reports shall be made and the tax estimated therefrom, there is little difficulty in construing the words "capital stock paid in" as including the property of the corporation. It is not uncommon in taxing statutes to construe "capital" and "capital stock" as referring to the same thing. 1 Cook on Corporations (8th Ed.), § 8; 2 Clark & Marshall on Private Corporations, § 375; 1 Desty on Taxation, § 74; and, as was said in *Powers* v. *Railway Co.,* 201 U. S. 559 (26 Sup. Ct. 556):

"The terms 'share,' 'stock,' 'capital' and 'capital stock' are of frequent and not uniform use, and we have often to turn to the context to see what is intended by its use in a particular case."

"Where, by its charter, a corporation is required to pay 'in lieu of all other taxes' an annual tax of a certain per cent. on the 'amount of capital' or 'amount of capital stock' *paid in,* the charter tax is upon the capital stock of the corporation and the shares of the stockholders are not exempt; but where it is required to pay such a percentage 'on each share of stock' the charter tax is upon the shares and the provision exempts the several shareholders from taxation on their shares, *but it does not also exempt the corporation from taxation on its capital stock, or on its surplus and undivided profits, or from the payment* of an occupation or privilege tax."    37 Cyc. p. 912.

See, also, *Memphis* v. *Memphis City Bank,* 91 Tenn. 574 (19 S. W. 1045), and later affirmed in 161 U. S. 186 (16 Sup. Ct. 466).

In *Powers* v. *Railway Co., supra,* the Supreme Court of the United States referred to and construed this taxing provision, which we are now considering, although it was not material in that case.    The following will indicate the view Mr. Justice Brewer entertained as to the construction which it should receive:

"By section 9 the tax is 'on the capital stock of said company paid in.'    Clearly that refers to the property which the corporation has received and presumably holds.    It is not the individual property of the shareholders which is contemplated, but that which is in the treasury of the corporation, or included among its assets.    This as we have seen is the ordinary meaning of the term 'capital stock.'    Further, we find that this tax is to be 'in lieu of all other taxes, except for penalties imposed upon said company.'    In other words, the tax upon the company of one per cent. may be increased by penalties imposed upon the company and in no other way.    Again, the tax is to 'be estimated upon the last annual report of said corporation.'    While such report might be ex-

pected to include not merely the property belonging to the corporation but also the number and names of the stockholders and the number of shares held by each, and possibly also the amount paid in by each, yet the word 'estimated' carries with it the idea of valuation rather than of mathematical apportionment. It suggests that the property reported by the corporation is to be the basis upon which the assessors shall make their valuation, so that the tax is 'estimated' upon that property rather than fixed by the mere process of multiplication or division. That the tax is to be paid by the company is of course not conclusive on the question, but it is in harmony with all the other provisions of the section."

This is undoubtedly the reasonable view, and is the one which is urged by the attorney general in the present case.

I am of the opinion that the taxing clause upon its face, with the aid of relevant legislation, which was a part of the charter, shows conclusively that the words "capital stock paid in" were intended by the legislature to include all of its capital investments. This construction is supported by the language of the act, is approved by the Supreme Court of the United States, is manifestly just to the people of this State, and in accord with defendant's contract.

2. *If the State's theory of construction be correct, is it now estopped to have that construction enforced?* It is the contention of defendant that its construction of the taxing clause has been acquiesced in for so many years that it amounts to a practical construction of the contract and cannot now be disturbed. The State argues that the situation is such that the doctrine of estoppel ought not in law nor justice to be applied.

The record fairly shows that the first auditor general, who dealt with this tax, acquiesced in defendant's construction and computed the tax upon the basis of the paper shares, and all of his successors have accepted it. It does not appear that any question con-

cerning this construction was ever raised by any State officer until this litigation began. It appears that in certain years the statutory reports were made; in other years they appear to have been omitted, and for several years it is not shown definitely whether any report was made. It is fair to assume from the record that the auditors general made a computation of one per cent. on the amount of the paper shares, and accepted that sum without question as the tax. An example of the many indorsements made by him on the books is shown by the following:

"Received and filed June 4, 1873, H. R. Pratt, deputy auditor general. Tax due July 1, 1873, $25,171.40. Bill mailed June 20, 1873, to J. H. Muir, secretary, Detroit, Michigan."

Under these circumstances the question arises whether the State is estopped to insist that the exemption does not extend to the seven or eight million dollars of capital assets which defendant has accumulated since the taxing clause was granted. In the discussion of this question one phase of it has not received, in my opinion, the consideration it should have had. The question of taxation with the incident power of exemption involves one of the sovereign powers of the State. The State is never estopped to exercise any attribute of sovereignty unless it appears to have surrendered it upon a consideration in the most clear and explicit terms, and is *never* estopped because of the ignorant, indifferent or wilful acts of its servants. If the State were acting in its proprietary capacity it might be equitably estopped, but the acts of careless and recreant public servants can never estop the State from exercising an attribute of sovereignty, however long the practice may have been continued. It is easy to see why this is so. If the acts of indifferent and recreant public servants could estop the State in the exercise of its sovereignty in a few years, it would so limit its power that it could

not exercise the functions of government.    It is only when the legislature has expressly and in unmistakable terms surrendered a part of its sovereignty upon a consideration that it can be insisted upon.    This principle is well stated in 10 R. C. L. p. 704:

"It has been denied and affirmed with equal confidence that an equitable estoppel can be applied to the government.    It is, however, quite well settled that when the State makes itself a party to an action or to a contract, or grant in its proprietary capacity, it is subject to the law of estoppel, as other parties litigant or contracting parties.    And so, a State department in a matter of procedure and within the scope of departmental powers may be estopped.    But the State cannot be estopped to exercise its sovereign power."

"The neglects or omissions of public officers as to their public duties will not work an estoppel against the State.    Consequently a State is not estopped from levying a tax for the reason that no attempt has been made to assess the property for many years, nor from insisting on the condition prescribed for a foreign corporation to do business in the State, by failure of officials to require compliance with the law at the proper time.    And, of course, the State cannot be estopped by the unauthorized acts of its officers." *Id.* 705.

The rule is stated in 16 Cyc. p. 780, as follows:

"The weight of authority is to the effect that the doctrine of equitable estoppel does not apply to the government, at all events, in the case of unauthorized acts or omissions on the part of its officers and agents. Nor are public officers concluded by acts done in their official capacity.    So, too, it has been held that the doctrine of estoppel will not apply to a private individual where the public interest is concerned."

The South Carolina court has discussed the question of estoppel and whether it could be established by the acts of its agents:

"The doctrine of equitable estoppel has no application to a sovereign State.    Equitable estoppel rests upon an implication of fraud in the parties sought to be estopped, and fraud ought not to be imputed to the sovereign.    The State can only act under its constitution and through its legislative enactments pursuant thereto, and can only ratify in the manner in which it could originally authorize; and if it could be estopped to assert the truth, the effect might be to fix upon the State responsibilities in conflict with its constitution and laws.    All men are bound to take notice of a special authority of the State's officers, and when dealing with them outside their authority they assume the peril with their eyes open, and cannot be heard to say that they placed reliance upon the State.    The question is not one of intention, but of power; and if the officer has not power to act, his action is not State action, and so affords no basis upon which to predicate estoppel against the State.    And if it were in any sense a question of intention the State's intention can only be evidenced in a constitutional way."    *Carolina Nat. Bank* v. *State*, 60 S. C. 465 (38 S. E. 629, 85 Am. St. Rep. 865).

In *Vicksburg, etc., R. Co.* v. *Dennis*, 116 U. S. 665 (6 Sup. Ct. 625), the Supreme Court announced the same principle:

"It has been said that 'neither the right of taxation nor any other power of sovereignty will be held by this court to have been surrendered, unless surrender is expressed in terms too plain to be mistaken;' that exemption from taxation 'should never be assumed unless the language used is too clear to admit of doubt;' that 'nothing can be taken against the State by presumption or inference; the surrender, when claimed, must be shown by clear, unambiguous language, which will admit of no reasonable construction consistent with the reservation of the power; if a doubt arises as to the intent of the legislature, that doubt must be solved in favor of the State;' that a State 'cannot by ambiguous language be deprived of this highest attribute of sovereignty;' that any contract of exemption 'is to be rigidly scrutinized, and never permitted to extend, either in scope or duration,

beyond what the terms of the concession clearly require;' and that such exemptions are regarded 'as in derogation of the sovereign authority and of common right, and therefore not to be extended beyond the exact and express requirement of the grants, construed *strictissimi juris.*' "

The Illinois supreme court is in accord with this principle:

"It is a familiar doctrine that the State is not embraced within the statute of limitations, unless specially named, and, by analogy, would not fall within the doctrine of estoppel.   Its rights, revenues, and property would be at fearful hazard, should this doctrine be applicable to a State.   A great and overshadowing public policy of preserving these rights, revenues, and property from injury and loss by the negligence of public officers, forbids the application of the doctrine.   If it can be applied in this case, where a comparatively small amount is involved, it must be applied where millions are involved, thus threatening the very existence of the government.   The doctrine is well settled that no laches can be imputed to the government, and by the same reasoning which excuses it from laches, and on the same grounds, it should not be affected by the negligence, or even wilfulness, of any one of its officials." *People* v. *Brown,* 67 Ill. 435.

In a bill filed by the State to recover back taxes the Illinois Central Railroad Company argued the State was estopped to inquire as to the correctness of certain semi-annual statements made by it on account of the great lapse of time.   The court said:

"Counsel for appellee insist that the State is estopped at this late date from inquiring into the correctness of these semi-annual statements; that this charter being a contract between the parties, the doctrine of estoppel will apply to the State here as it ordinarily would to a private party.   The rule invoked by appellee on this point applies only to those contracts where the State goes into business as a partner with individuals or in competition with her citizens. *Brown* v. *Trustees of Schools,* 224 Ill. 184 (79 N. E.

579, 8 Ann. Cas. 96, 115 Am. St. Rep. 146) ; 2
Herman on Estoppel, § 1128; 25 Cyc. p. 1007; 19 Am.
& Eng. Enc. Law (2d Ed.), p. 190).   This charter
is not within the class of contracts just referred to.
If the State, in enforcing this contract, acted in its
private capacity as distinguished from its govern-
mental capacity, then the doctrine of estoppel might
be invoked.   *Barnard* v. *County of Sangamon*, 190
Ill. 116 (60 N. E. 109) ; *City of Chicago* v. *Sexton*,
115 Ill. 230 (2 N. E. 263) ; *Chicago, etc., R. Co.* v.
*City of Joliet*, 79 Ill. 25.   But the State, in enforcing
the provisions of this charter contract, is not acting
in its private capacity.   The contract has nothing
to do with trade relations between private individuals
and the government, but is one exempting property
from ordinary taxation for an equivalent.   The
revenue to be paid under this charter is simply a sub-
stituted tax—a special form of taxation (*State* v.
*Railway Co.*, 128 Wis. 449 [108 N. W. 594]), for the
benefit of all the people of the State.   In attempting
to collect this revenue the State is acting in its govern-
mental capacity, the same as when it is attempting
to collect taxes under the general revenue laws.   This
being so, public policy requires that the State shall not
lose through the laches or negligence of its officers.
*People* v. *Brown*, 67 Ill. 435; *Catlett* v. *People*, 151
Ill. 16 (37 N. E. 855) ; *Whittemore* v. *People*, 227 Ill.
453 (81 N. E. 427, 10 Ann. Cas. 44)."   *State* v. *Rail-
road Co.*, 246 Ill. 188, 234 (92 N. E. 814).

In *Hibernian Benevolent Society* v. *Kelly*, 28 Or.
173 (42 Pac. 3, 30 L. R. A. 167, 52 Am. St. Rep.
769), the State had recognized for several years that
its property was exempt.   When an attempt was made
to subject it to tax it was argued that the State was
estopped on account of having recognized the exemp-
tion for so many years.   The court said:

"It is insisted by the plaintiff that the State is es-
topped from levying the tax in question for the reason,
that while it has owned the property assessed since
1877, no attempt was made to assess it until the year
1890, and that, relying upon that fact, it borrowed in
that year $33,000 on a mortgage, to enable it to erect

the buildings now on the premises, and stipulated and agreed to pay the taxes on such mortgage.   But the neglect or omission of the proper officers to assess the property cannot control the duty imposed by law upon their successors, or affect the legal construction of the statute under which its exemption from taxation is claimed.   *Vicksburg, etc., R. Co.* v. *Dennis,* 116 U. S. 665 (6 Sup. Ct. 625)."

The rule in the Dominion of Canada is the same.   It was held in *Humphrey* v. *The Queen,* 2 Ex. C. R. 386, that as her Majesty was defendant the doctrine of estoppel could not be invoked against her.     Also, *The Queen* v. *Black,* 6 Ex. C. R. 236.     Other cases in accord with this principle are *Barker* v. *Crum,* 177 Ky. 637 (198 S. W. 211, L. R. A. 1918F, 673) ; *Chicago, etc., R. Co.* v. *Douglas County,* 134 Wis. 197 (114 N. W. 511, 14 L. R. A. [N. S.] 1074) ; *United States* v. *Walker,* 148 Fed. 1022; *Pulaski County* v. *State,* 42 Ark. 118; *Alexander* v. *State,* 56 Ga. 478; *Hennepin County Com'rs* v. *Dickey,* 86 Minn. 331 (90 N. W. 775) ; *Oregon* v. *Electric Co.,* 52 Or. 502 (95 Pac. 722, 98 Pac. 160) ; *State* v. *Savings Bank,* 106 Ind. 435 (7 N. E. 379) ; *State* v. *Railroad Co.,* 52 Fed. 450.

The State is therefore not estopped by the practical construction contended for.     Unless the statute is ambiguous the question of practical construction must give way to the terms of the statute.    25 R. C. L. p. 1043; 2 Elliott on Contracts, § 1542; *Menage* v. *Rosenthal,* 175 Mass. 361 (56 N. E. 579).

Chief Justice COOLEY said in *Westbrook* v. *Miller,* 56 Mich. 148, 152:

"The rule which favors the acceptance of a practical construction of statutes has its limits, and must not be suffered to defeat the manifest purpose of the legislation."

Even where a statute is ambiguous, the construction given it by the executive department of the State will not be followed by the court when clearly erroneous.

*Koy* v. *Schneider*, 110 Tex. 369 (218 S. W. 479, 221 S. W. 880); *Commonwealth* v. *Railroad Co.*, 95 Ky. 60 (23 S. W. 868).

In *VanDyke* v. *City of Milwaukee*, 159 Wis. 470 (146 N. W. 812, 150 N. W. 509), it was said.

"But a practically contemporaneous construction of an administrative department cannot be successfully invoked to override a plain meaning of the statute."

In *Commonwealth* v. *Railroad Cos.*, 95 Ky. 60, 73 (23 S. W. 868), it was held:

"If the language of an act be certain, its object can never be frustrated by any amount of contemporaneous interpretation, no matter how consistent or how widely adopted it may have been.    A construction against the plain meaning of the law as expressed by its terms, even in aid of justice or right, or to avoid an absurdity, is never permissible.    Endlich, Interpretation of Statutes, p. 506."

"It is the function and duty of the courts to interpret the meaning of a statute, and when they can ascertain the legislative intent by the use of intrinsic aids alone, resort to its contemporaneous construction by other persons is both unnecessary and improper. It is only where the language of the statute is ambiguous or uncertain that the opinions entertained by contemporaries as to its meaning may be consulted." *Barker* v. *Crum*, 177 Ky. 637 (198 S. W. 211, L. R. A. 1918F, 673).

In *Houghton* v. *Payne*, 194 U. S. 88 (24 Sup. Ct. 590), it was argued that the construction by numerous postmasters general that certain publications were periodicals and were entitled to second class mail privileges, the court said:

"Great stress is laid by counsel upon the original interpretation of the term 'periodical,' as applied to these books, which it is said was continued without change under different administrations and by several successive postmasters general, and from 1879, the date of the passage of the act, until 1902, when the

certificates granted by the former postmasters general were revoked by the defendant and a different classification made of the publications now in issue, that the attention of congress was repeatedly called to the evils and to the large expense incurred by the Government by the admission of publications of this description to mail matter of the second class; that congress seriously considered these representations, and committees made voluminous report thereon, yet congress persistently refused to change by legislation the ruling of the postmasters general in that regard.    *    *    *

"The action of the Government consists merely in the revocation of a certificate or license admitting these publications as mail matter of the second class. *No vested right having been created by such certificate,* no contract can be said to be impaired by its revocation. *Salt Co. v. East Saginaw,* 13 Wall. (U. S.) 373; *Grand Lodge v. New Orleans,* 166 U. S. 143, 147 (17 Sup. Ct. 523). It was said, in that case, that the construction is one which, though inconsistent with the literalism of the act, certainly consorted with the equities of the case. *Whereas,* in the case under consideration, if we are to believe the statements of counsel, which are not denied, *the carriage of these publications as second class mail matter entails annually an enormous loss upon the Government and constitutes an odious discrimination between publishers of books and publishers of the so-called periodicals.*

"But in addition to these considerations it is well settled that it is only where the language of the statute is ambiguous and susceptible of two reasonable interpretations that weight is given to the doctrine of contemporaneous construction. *United States v. Graham,* 110 U. S. 219 (3 Sup. Ct. 582); *United States v. Finnell,* 185 U. S. 236 (22 Sup. Ct. 633). Contemporaneous construction is a rule of interpretation, but it is not an absolute one. It does not preclude an inquiry by the courts as to the original correctness of such construction. A custom of the department, however long continued by successive officers, must yield to the positive language of the statute. As was said in the *Graham Case* (p. 221), 'if there were ambiguity or doubt, then such a practice, begun so early and continued so long, would be in the highest degree persuasive, if not absolutely controlling,

in its effect.   But with language clear and precise and with its meaning evident there is no room for construction, and consequently no need of anything to give it aid.   The cases to this effect are numerous. *Edwards' Lessee* v. *Darby,* 12 Wheat. (U. S.) 206; *United States* v. *Temple,* 105 U. S. 97; *Swift Co.* v. *United States,* 105 U. S. 691; *Ruggles* v. *Illinois,* 108 U. S. 526 (2 Sup. Ct. 832).' "

To the same effect are *Whittemore* v. *People,* 227 Ill. 453 (81 N. E. 427, 10 Ann. Cas. 44) ; *United States* v. *Graham,* 110 U. S. 221 (3 Sup. Ct. 582) ; *United States* v. *Tanner,* 147 U. S. 661 (13 Sup. Ct. 436) ; *United States* v. *Tod,* 297 Fed. 172; *Chicago, etc., R. Co.* v. *United States,* 242 U. S. 621 (37 Sup. Ct. 241) ; *People* v. *Sergel,* 269 Ill. 619 (110 N. E. 124) ; *People* v. *Subway Co.,* 187 N. Y. 58 (79 N. E. 892) ; *Hord* v. *State,* 167 Ind. 622 (79 N. E. 916) ; *State* v. *Brewer,* 64 Ala. 287; 36 Cyc. p. 1139.

But we are not obliged to depend on foreign authorities to settle the question of estoppel.   In the case of *Lake Shore, etc., R. Co.* v. *People,* 46 Mich. 193, the precise question here involved was raised in that case.   The question of estoppel by practical construction was involved.   It also involved the misconstruction of the taxing clause of the special charter by the auditor general as in this case.   Mr. Otto Kirchner, who was attorney general at that time, argued that an estoppel does not operate against a sovereignty. The court said:

"The auditor general having assessed the company upon the reports made by it, for the several years covered by this action, and such assessments having been paid, it is claimed that in the absence of fraud by the company the action of the auditor was final.

"The auditor general is required to ascertain and estimate, from the annual report made by the company, the amount of the tax chargeable against it, and for this purpose he may require the company to make farther and additional reports.   It is not claimed that there was any fraud practiced by the company,

and the auditor general seems to have been satisfied with the annual reports as made, as he did not call for anything farther. An examination of one of the reports made, all being alike, shows that the company gave therein the aggregate amount upon which it claimed the State could fix it, but whether correct or not, or whether the company was not liable to pay a tax upon the items in controversy in this case the auditor general from the report could not determine. The company did not set up or present the facts in its report concerning these disputed items and leave it to the auditor general to exercise his judgment and make an assessment therefrom. Had the company done so and the auditor made his assessment therefrom, or had he called for a further report, or in any way passed upon the facts and made an assessment accordingly, the question presented would have been very different. In this case the auditor general seems to have accepted the conclusion of the company as to the amount upon which it was liable to pay taxes, and having done so the amount of the tax was a matter of computation, a merely ministerial act. The only discretion or judgment he exercised, if any, was to not call for a farther report, but this was not a discretion or judgment passed upon any facts, but if anything, simply that he would not ask for or look into the facts at all. The law declared that the company should pay a certain tax upon its capital and loans actually employed in this State. From this the auditor general had no power to exempt or relieve the corporation, and if in making and filing its report the corporation did not set forth the correct amount, the neglect or failure of the auditor general to perform his duty would not operate as a payment or discharge to the company. The State ought not to be concluded by the mere nonaction of one of its officers. It is sufficient for the protection of all, to hold the State bound, where an officer ascertains the facts and passes judgment thereon. The company made out its report upon a mistaken basis, and if it thereby misled the auditor the State should not be the loser."

It would be difficult to find two cases more parallel on the material questions and, in my judgment, it should control the present one.

It may be well in this connection to consider the case of *People, ex rel. Attorney General,* v. *Railroad Co.,* 145 Mich. 140, about which so much has been said by defendant. At the time to which the issue in this case relates the Michigan Central Railroad Company was operating and paying taxes under its special charter. The legislature amended its charter authorizing the company to make loans and secure them for the purpose of building the part of the railway lying outside of the State. In making its annual reports it deducted that part of the capital employed in the road outside of the State. The position of the State was that the amendment became a part of the charter because accepted by the company and thereby bound it to pay taxes on that part of its capital. This was denied by the company and raised a serious legal question. It appeared that the reports making the deduction of the capital stock outside of Michigan were questioned by the auditors. One of the auditors was so much in doubt whether it should be deducted that he asked the opinion of the attorney general, and he decided the position of the company was the right one, that the capital employed in a foreign State was not taxable. The matter was afterwards called to the attention of Governor Bagley, and he in turn called it to the attention of the legislature, and it was also called to the attention of the Honorable John T. Rich, at that time railway commissioner, and afterward governor. Under these circumstances, the court held that the State was bound by the practical construction which the auditor general had given to it. In this case the auditor general examined the reports and exercised his discretion and estimated the tax. In the case before us it does not appear that any auditor general ever questioned a report. It was never referred to the attorney general, never was referred to the governor, nor to the legislature. In the *Michigan Central Case* the auditor exercised the discretion vested in him by the

legislature. In the present case the auditor general never exercised the power vested in him, and never estimated the tax from the reports, he simply computed it. Herein lies the difference in these two cases. It is quite evident that the court, when writing the *Michigan Central Case*, recognized this distinction or else it would have expressly overruled the case of *Lake Shore, etc., R. Co.* v. *People, supra.*

The rules to be extracted from these authorities are:

(1) That a State cannot be estopped to exercise any of its attributes of sovereignty unless it can be shown that the legislature, for a consideration, has expressly surrendered it, and this must be done in clear and unmistakable language.

(2) The State is *never* estopped in the exercise of its sovereign right by the laches of its servants, nor by the ignorant, indifferent or recreant action of its public servants, however long such action may have continued.

(3) The State may be equitably estopped when acting in its proprietary capacity, and when interests have vested and justice demands it.

(4) The State cannot be estopped in the exercise of its sovereignty by the practical construction of a State department when the construction is clearly erroneous.

If we apply these rules, which are nowhere denied, to the present controversy, what becomes of defendant's contention that the State is estopped to put its construction into effect? It cannot be denied that the question before us is the exercise of a sovereign right or a governmental function. Justice FELLOWS stated in *Union Steam Pump Sales Co.* v. *Secretary of State,* 216 Mich. 261, that the levying of taxes to meet the expenses of government is the highest prerogative of government, and the supreme court of Illinois agrees with this holding. *State* v. *Railroad Co.,* 246 Ill. 188 (92 N. E. 814). If this be a sovereign right it must prevail unless it can be shown that the State has expressly surrendered it for a consideration.

There is nothing in the record which shows any such express surrender, and I do not think there is any such claim.

There is no ambiguity in the taxing clause.   It clearly provides for the payment of an annual tax of one per cent. on the "capital stock paid in."   Even if the provision ended here it would not be ambiguous if the words "capital stock" were construed as taxing statutes are usually construed to mean all the property of the corporation.

But the provision does not stop here, it goes farther, and provides that "the said tax shall be estimated upon the last annual report of the company."   This reference to the annual report made it a part of the contract.   Upon what theory would the annual report have been required to disclose "the amount expended for the purchase of lands for the construction of the road, for buildings, for engines and cars respectively" except to enable the auditor to estimate what had been added during the year to the original capital account? There is no other apparent reason for compelling a report which would disclose the entire assets of the railway.   The idea in requiring an annual report of all the items mentioned was to enable the auditor to have facts before him from which he could form some independent judgment of the annual additions, and not be obliged to rely wholly on the conclusions of the company.   To a reasonably fair man, to an honest official who was anxious to discharge his public duty, there was no ambiguity, and if there were not, then there can be no practical construction now.   It was simply a case where the plain letter of the law has been disregarded all these years, to the great detriment of the State's revenues.

There is no claim that the legislature ever expressly sanctioned defendant's construction.   Indeed, there is no showing that the matter was ever called to the attention of the legislature, nor that it was ever called

to the attention of the executive. The legislature placed a duty upon the auditor general to require annual reports, and specified what they should contain, and therefrom the auditor was required to estimate the tax. The records fail to show, so far as I have examined them, that he ever estimated the tax from a single report. The only thing he did was to compute the tax on the amount represented by the paper shares at one per cent. and receipt for the tax. If the auditors general and those charged with a similar duty have refused to obey the law and to exercise the discretion vested in them by the legislature, there can be no estoppel under any theory. *Lake Shore, etc., R. Co.* v. *People,* 46 Mich. 193. By invoking the rule that the State can never be estopped in the exercise of its sovereign power by the supineness and neglect of its unfaithful servants the whole contention of defendant must fail.

Under these rules of law there is no room for defendant's theory of estoppel by practical construction, and its contention is equally weak in the field of equity and justice. This company has accumulated something like $7,000,000 in capital investment since the consolidation in 1855. It has never paid any tax on this excess value, and defendant's counsel say that the excess would amount to $3,500,000. If the defendant has deprived Michigan and her public schools of $3,500,000, which it in justice and equity ought to have paid, how does that furnish any equitable or just basis for defendant to keep on withholding the excess for all the years to come? There is no showing by defendant that it has been deceived or misled to its prejudice by the State, nor that its conduct has been thereby influenced to its injury, and without this showing there can be no estoppel. *Porter* v. *Goudzwaard,* 162 Mich. 158, 161; *Detroit Savings Bank* v. *Loveland,* 168 Mich. 163, 172. Instead of being the loser in the past defendant has been the gainer to the extent of $3,500,000.

There is no showing that it will be prejudiced in the future by paying its taxes in accordance with its contract.

It is argued, however, that the defendant has borrowed money and issued mortgages against the property on the faith of this construction. If any mortgagee of the railroad property has had enough interest to inspect the taxing clause of the contract he has ascertained that defendant was required to pay taxes on all its capital assets at a very low annual fixed rate, and that its tax base must be estimated from its annual reports. There is certainly nothing in this contention which should earn the defendant the eternal privilege of going wrong in all the years to come because it has done so for fifty-five years.

The difference now between the two theories of arriving at the tax is approximately $75,000 a year. As the years go by this difference will increase. Because of the laxness of its officials the State is not insisting upon the payment of the $3,500,000, which the defendant has escaped and profited by in the years gone by. The question now is for the future. If we multiply the excess of $75,000 by all the years to come (because the franchise is perpetual) it produces a sum so amazingly large that it is difficult to comprehend it, and it resolves itself into a question whether this vast sum shall in the future be paid to the State of Michigan or be retained by our neighbor, the Dominion of Canada. The law, justice to every tax payer of Michigan, justice to the other railroads paying *ad valorem* taxes with a rate two and one-half times greater, and exact justice to the Dominion of Canada all demand that defendant should in the future pay to the State the taxes agreed upon in its contract.

The judgment of the trial court should be reversed, and the prayer of the State's petition granted.